173 P.2d 490

## PECOS VALLEY ARTESIAN CONSERVANCY DIST. v. PETERS.

### No. 4878.

Supreme Court of New Mexico.

Aug. 28, 1945.

Rehearing Denied Oct. 26, 1946.

W. A. Dunn, G. T. Watts, and O. O. Askren, all of Roswell, for appellant.

L. O. Fullen and Harold Hurd, both of Roswell, for appellee.

Clarence E. Hinkle, of Roswell, amicus curiae.

SADLER, Justice.

The question for decision is whether an artesian conservancy district organized under the provisions of L. 1931, c. 97 (1941 Comp., Art. 13, c. 77) is authorized to maintain a suit to enjoin the use of water taken from an artesian well drilled on land located outside the exterior boundaries of the district but alleged to be supplied by the artesian basin underlying the lands within the territorial boundaries of the district to the detriment of the water users of the district.

As filed the complaint upon which the hearing was had joined as co-plaintiffs five landowners, each of whom was alleged to be the owner of lands within the district which were and had been for more than 30 years irrigated by wells supplied by waters from the artesian basin underlying the lands within the district. Prior to trial, however, four of the five co-plaintiffs upon their own several applications were dismissed out as plaintiffs and the fifth went out upon suggestion of the original plaintiff, the conservancy district, that a mistake had been made in his joinder as a co-plaintiff upon the assumption that he had a sufficient interest to seek relief as such. This left as the sole plaintiff, The Pecos Valley Artesian Conservancy District.

The cause was put at issue by plaintiff's first amended complaint, the defendant's first amended answer and the plaintiff's reply thereto. Certain facts are settled by the pleadings, to-wit: (1) That the land on which the defendant drilled his well has never been within the territorial boundaries of the district, unless action by the State Engineer subsequent to the drilling of defendant's well agreed by both parties to have been unauthorized, placed such land territorially within the district; (2) that at the time of drilling the well the defendant had made no application for a permit to drill the same pursuant to the provisions of 1941 Comp. § 77-1204; (3) that after drilling the well and applying to beneficial use waters therefrom on 285.6 acres of land in quantities of 2000 gallons per minute, the defendant filed in the office of the State Engineer a declaration of water rights pursuant to 1941 Comp. § 77-1105, followed by an amended declaration correcting the number of acres irrigated to 285.6 (acres); (4) that prior to the drilling of this well artesian water had never been developed on defendant's land.

Notwithstanding the agreement of the parties on the foregoing salient facts, issue was joined in the pleadings on certain

others of equal importance. It was alleged by the plaintiff and denied by the defendant that the latter's well was taking water from the Roswell Artesian Basin to the detriment of other water users of the plaintiff district. Similarly, there was allegation and denial that there existed unappropriated waters in the Roswell Artesian Basin, either at the time the defendant began drilling his well or at any time thereafter.

The trial judge, deeming the case ripe for judgment on admitted facts, heard no evidence. He ruled as a matter of law that the Pecos Valley Artesian Conservancy District was not a proper party plaintiff and that it was without power or authority to maintain the suit. Although there was no formal motion for judgment on the pleadings, the defendant appears to have invoked a ruling on the plaintiff's capacity to maintain the suit, following which the latter requested certain conclusions of law. These moves were treated by the trial court as authorizing it to decide the case on the pleadings and it acted accordingly. The plaintiff's requested conclusions of law (all of which were refused) and those actually adopted by the trial court, so narrow and delineate the primary issue between the parties that we set them out in full, as follows:

"This matter being before the court at this time on the sole question as to whether The Pecos Valley Artesian Conservancy District is a proper plaintiff, the following Conclusions of Law are requested by said plaintiff.

"I. The Pecos Valley Artesian Conservancy District, a corporation has the power generally to seek by suit to conserve the waters of the artesian basin.

"II. The Pecos Valley Artesian Conservancy District has such an interest in the result of this suit which permits them (it) to sue for the purpose of conserving the artesian waters of the District.

"III. The mere fact that defendant's land upon which the Artesian well was drilled is not within the exterior boundaries of the District is not sufficient to bar this plaintiff from sueing to determine whether there was unappropriated water and whether the defendant's well has tapped the same artesian basin the waters of which this plaintiff seeks to conserve.

"IV. It is the duty of this plaintiff to do all lawful things to conserve the waters of the artesian basin in question and if a suit is deemed necessary, to do that thing, this plaintiff has the right to maintain such suit even though the District as such owns no water."

Three days after the filing of the foregoing request for conclusions of law by the plaintiff, the trial court made its own conclusions of law embraced in an order dismissing plaintiff's suit, and reading as follows:

"This matter coming on this day to be heard by the Court on the motion of defendant that the Pecos Valley Artesian Conservancy District, plaintiff, is not a

proper plaintiff in this action and fails to state a claim against defendant upon which relief can be granted, and said plaintiff and said defendant being represented by O. O. Askren and G. T. Watts for plaintiff, and Harold Hurd and L. O. Fullen for defendant, and the matter having been fully argued and submitted to the Court, the Court finds:

"1. That both parties, plaintiff and defendant, agree and have pleaded that the artesian well of the defendant, Frank Peters, is not now and never was within the defined boundaries of the Pecos Valley Artesian Conservancy District.

"2. That said plaintiff, The Pecos Valley Artesian Conservancy District is not a proper plaintiff; that it has no power, authority or jurisdiction to maintain this suit.

"3. The Requested Conclusions of Law by said plaintiff, The Pecos Valley Artesian Conservancy District, numbered from one to four, inclusive, are refused.

"It is therefore, ordered that the suit of The Pecos Valley Artesian Conservancy District, plaintiff, against the defendant Frank Peters, be and the same hereby is dismissed.

"To all of which the said plaintiff, the Pecos Valley Artesian Conservancy District, excepts."

The plaintiff as appellant prosecutes this appeal for the revision and correction of the order so entered.

In order intelligently to decide the question here presented, it will be necessary to consider several statutes having a bearing thereon. The first statutory authority for the appropriation of underground waters appears to have been given by L. 1927, c. 182, 1929 Comp. §§ 151-201 to 151-205, which this court held unconstitutional in Yeo v. Tweedy, 34 N.M. 611, 286 P. 970, as an attempt to extend by reference existing statutes other than procedural in violation of Const. Art. 4, § 18. The nullification of this statute by court decision was followed by its re-enactment in amplified and enlarged scope as L. 1931, c. 131, 1941 Comp. §§ 77-1101 to 77-1111. This statute will be referred to later in greater detail. However, the plaintiff was organized as an artesian conservancy district under the provisions of L. 1931, c. 97, 1941 Comp. §§ 77-1301 to 77-1321, which, except for an amendment of § 18 thereof by L. 1941, c. 98, § 4, still exists in its original form. Sections 1 and 2 of the enabling act read:

"The purpose of this act is to provide for the organization of artesian conservancy districts to conserve, where necessary, the waters in any artesian basin or basins within the state, the boundaries of which have been scientifically determined by investigations, and where such waters have been beneficially appropriated for private, public, domestic, commercial or irrigation purposes, or otherwise."

"Any artesian conservancy district organized pursuant to the provisions of this act shall include all lands overlying any such artesian basin and any land outside of the boundaries thereof upon which waters

from such basin are being used, either for private, public, commercial, domestic or irrigation purposes, or otherwise.

"Two (2) or more such artesian basins or reservoirs may be embraced in the same conservancy district, where the same are so closely related, geographically or otherwise, that the waters therein can more surely and effectively be conserved by the unified control of one (1) district, and where the improvements contemplated will tend to conserve the waters in each basin so included."

Section 3 of the Act authorizes initiation of proceedings to establish an artesian conservancy district by the filing of a petition in the district court of the county wherein the greater portion of the lands to be embraced in the district are situated. It must have been signed by owners of more than one-third of the real property in the proposed district, in either acreage or value, as shown by the last preceding assessment roll on the county or counties into which any portion of the district extends. The petition must give the proposed name of the district, a statement of the purpose for which it is to be formed and disclose how the property embraced in the district will be benefited by the accomplishment of some one or more of the purposes enumerated, "and giving a general description of the property to be included in the proposed district."

When the petition is filed, the court must fix a time and place not less than 60 days thereafter for hearing thereon and the clerk is called upon to publish notice of the hearing in each county in which there is property to be included in the proposed district, or if there be none in any such county, in a newspaper of general circulation in the proposed district. Only a general description of property to be included in the district, sufficient to enable an owner to determine whether or not his land is included, is required. Publication must be for at least once each week for four consecutive weeks.

Other sections of the Act authorize the filing of objections to the organization of the district and for hearings thereon. Under § 11, however, the Act provides that at such hearing, if the allegations of the petition are found to be true and objections have not been filed or, if filed, have been dismissed, then, it is further provided by said section:

"* * *, the court shall, by order, adjudicate all questions of jurisdiction, declare the district organized and give it a corporate name, by which, in all proceedings, it shall thereafter be known, but said decree shall not be final as to the boundaries of said district, or as to the lands to be embraced therein, until the approval of the report of the commissioners, as hereinafter provided, at which time a final decree as to the property to be embraced in the district shall be entered, and no appeal therefrom as to any particular tracts or parcels of property shall, in any way, prevent the district from functioning, nor prevent the levy of any taxes against such property in question pending the appeal therefrom.

"Upon declaring the district organized, the same shall be a political subdivision of the state of New Mexico, and a body corporate with all the powers of a public or municipal corporation; shall have power to sue and be sued, to incur debts, liabilities and obligations, to exercise the right of eminent domain and of taxation and assessment as herein provided and to do and perform all acts herein expressly authorized, and all other acts necessary and proper for carrying out to all intents and purposes the objects for which the district was created, and for exercising the powers with which it is invested." 1941 Comp. § 77-1311.

Under the provisions of § 13 of the Act, 1941 Comp. § 77-1313, it is made the duty of the court within ten days after declaring the district organized to appoint three owners of land within the district to determine and define the boundaries of the district and to make up a list of property to be embraced and included in the district. These persons are designated as "Commissioners." This section further provides:

"Said commissioners shall include all property in the district which has, within four (4) years, received some benefit, either directly or indirectly, from the artesian waters underlying the district, or which may be benefited in some degree by the improvements to be made by the district. Property benefited by the artesian waters, and the improvements to be made by the district, shall include property upon which waters from such basin, or basins, is, or may be, used for irrigation, domestic, public or commercial

purposes, and shall include any such property, whether the same be owned by an individual, corporation, village, town, city or other municipality, or public corporation."

Provision is made for the drawing up of an election code by the Commissioners under which directors are to be elected, one from each of 5 districts into which the Commissioners, with the approval of the court, are directed to divide the conservancy district. Election is to be by popular vote of the property owners in each district. After making provision for organizing the Board of Directors by election of a president and secretary and treasurer and for adoption of by-laws, § 17 of the Act, 1941 Comp. § 77-1317, among other things, provides:

"The board of directors are hereby vested with full power and authority to do and perform every act and thing necessary to carry out, to all intents and purposes the provisions of this act, purposes and objects for which the district is created, including the power to enter into contracts with, and engage all necessary agents and employees, and to fix their compensation, and to require of any such employees bonds for the faithful performance of their duties, as to the directors may seem proper."

In § 18 of the Act the directors are ordered to proceed, following formation of the district, with the cooperation of the State Engineer and United States Geological Survey, if such cooperation is offered, to outline plans and to make an estimate of the cost of improvements needed in the dis-

trict. This section, as originally enacted, further provides as follows:

"The improvements to be made shall be such as are calculated to accomplish the objects for which the district was created, and may include the plugging of all Artesian wells within the district found, by tests, to be materially leaking, *or wasting the waters of the Artesian basin,* as aforesaid; provided, however, where any such well is being beneficially used, the same shall not be plugged without the written consent of the owner thereof. All such artesian wells found to be wasting the waters *of the artesian basin,* as aforesaid, are hereby declared to be a public nuisance, and the Directors of the district, and those under their authority, shall have the right and authority to go upon the lands, upon which any such well is located, to abate such nuisance by plugging or repairing any such well." Laws 1931, c. 97.

This section, as already stated, has been amended by .L. 1941, c. 98, § 4, and in its present form the entire section reads as 'follows:

"After the formation of any artesian conservancy district, it shall be the duty of the board of directors from year to year to outline a plan or program of water conservation and administration, and they shall make an estimate of the cost of administration, equipment and improvements necessary to carry out such program from year to year, when the cost thereof is to be paid by tax levies. In carrying out any such plan or program the board of directors shall have authority to cooperate with the state engineer and the United States geological survey, where such cooperation is offered.

"The program to be carried out and the improvements to be made and the equipment to be purchased shall be designed to accomplish the objects and purposes for which the district was created, and may include the plugging of all wells within the district found by tests to be materially leaking or *wasting any waters included in the district.* The directors may proceed to carry out the improvements so outlined in such manner as may be deemed for the best interest of all concerned, and may enter into any contracts or do or perform any act or thing necessary or advisable to carry out to all intents and purposes the objects and purposes for which the district was formed, and shall have the right of ingress and egress at all reasonable times to all wells within the district for the purpose of making leakage tests, and otherwise determining that such wells are properly equipped and are being used so as *to conserve the waters included in the conservancy district.* All wells included in the district found to be leaking or wasting such waters, are hereby declared to be a public nuisance, and the directors of the district and those under their authority shall have the right, power and authority to go upon the lands upon which any such well is located to abate such nuisance by plugging or repairing any such well." (Emphasis ours) 1941 Comp. § 77-1318.

It is to be noted for such bearing as the change may have on the case, that the Legislature changes the phrase "wasting the waters of the Artesian basin," as it appears in the 1931 law, to the phrase "wasting any waters included in the district" in connection with directions as to plugging leaking wells.

The same session of the Legislature which enacted L. 1931, c. 97, also enacted another statute bearing on the question at issue in this case designated as L. 1931, c. 131, consisting of 11 sections. Sections 1 and 2 of said Act, 1941 Comp. §§ 77-1101 and 1102, read as follows:

"The waters of underground streams, channels, artesian basins, reservoirs, or lakes, having reasonably ascertainable boundaries, are hereby declared to be public waters and to belong to the public and to be subject to appropriation for beneficial use."

"Beneficial use is the basis, the measure and the limit to the right to the use of the waters described in this act."

Section 3 of this Act provides that any person desiring to appropriate underground waters shall make application to the State Engineer in a form to be prescribed by him in which the applicant shall designate the particular underground stream, channel, artesian basin, reservoir or lake from which water is to be appropriated, the beneficial use to which it is proposed to apply such water, the location of the proposed well, and so forth. The State Engineer is then called upon to give notice by publication in a newspaper of general circulation of the filing of such application and that objections to the granting of the permit may be filed within 10 days following last publication. After expiration of the time for filing objections, if none have been filed, the State Engineer is directed to grant the application if he finds there are unappropriated waters available in the underground stream, channel, artesian basin or reservoir.

If objections have been filed provision is made for a hearing in the courthouse of the county in which the proposed well will be located. If after such hearing it appears there are no unappropriated waters in the designated source, or that the proposed appropriation would impair existing water rights from such source, the application is to be denied. Sections 4, 5 and 6 of the Act 1941 Comp. §§ 77-1104, 77-1105 and 77-1106, read as follows:

"Existing water rights based upon application to beneficial use are hereby recognized. Nothing herein contained is intended to impair the same or to disturb the priorities thereof."

"Any person, firm or corporation claiming to be the owner of a vested water right from any of the underground sources in this act described, by application of waters therefrom to beneficial use, may make and file in the office of the state engineer a declaration in a form to be prescribed by the state engineer setting forth the beneficial use to which said water has been applied, the date of first application to bene-

ficial use, the continuity thereof, the location of the well and if such water has been used for irrigation purposes, the description of the land upon which such water has been so used and the name of the owner thereof. Such declaration shall be verified but if the declarant cannot verify the same of his own personal knowledge he may do so on information and belief. Such declarations so filed shall be recorded at length in the office of the state engineer and may also be recorded in the office of the county clerk of the county wherein the well therein described is located. Such records or copies thereof officially certified shall be prima facie evidence of the truth of their contents."

"Declarations heretofore filed in substantial compliance with section 5 hereof shall be recognized as of the same force and effect as if filed after the taking effect of this act."

The Legislature in 1933 enacted L. 1933, c. 122, amending § 9 of the foregoing Act, 1941 Comp., § 77-1109, but not in any respect material to the present controversy and adding, by way of amendment, in § 2 thereof, a new § 11, 1941 Comp. § 77-1111, reading as follows:

"The state engineer is hereby given the power and it is made his duty to formulate rules and regulations for the purpose of carrying out the provisions of (this) act, which rules and regulations shall be printed and made available for distribution to all applicants."

Still another statute, L. 1935, c. 43, 1941 Comp. §§ 77-1201 to 77-1212, must be considered if we give a complete picture of the statutory background. It is "an act relating to artesian wells and artesian basins; providing for the control and regulation of artesian wells; giving authority to the state engineer to promulgate rules and regulations governing the drilling, casing, repairing, plugging, and abandonment of artesian wells; defining waste of artesian waters, declaring such waste to be a public nuisance," etc.

Section 1 declares an artesian well for purposes of the Act to be an artificial well which derives its water supply from any artesian stratum or basin.

Section 2 of the Act reads:

"All artesian waters which have been declared to be public waters shall be under the supervision and control of the state engineer, as provided by this act, but where artesian conservancy districts have been duly organized pursuant to chapter 97 of the New Mexico Session Laws of 1931 and acts amendatory thereof, such districts shall have concurrent power and authority with the state engineer to enforce the regulatory provisions, as herein provided, in so far as the waters to be conserved and controlled by the respective districts are affected.

"This act shall not be construed to affect the provisions of chapter 131 of the New Mexico Session Laws of 1931, being 'An act relating to underground waters, declaring certain underground waters to be public waters and relating to the beneficial appro-

priation thereof and repealing article 2 of chapter 151 of the New Mexico Statutes Annotated, 1929 Compilation', and the state engineer may intervene on behalf of the state in any proceeding brought by or against any artesian conservancy district where it is necessary for the proper protection or adjudication of rights to the public waters of the state."

Under section 4 the State Engineer is directed to make and enforce reasonable rules and regulations to govern the drilling, casing, plugging and abandonment of artesian wells. The section further provides that before any artesian well is to be drilled the owner of the land on which same is to be drilled must apply to the State Engineer for permit to drill the same and a violation of this requirement is made a misdemeanor punishable by fine. L. 1935, c. 43, § 12, 1941 Comp. § 77-1212.

The act goes on in section 7 to declare as a public nuisance any abandoned artesian well as to which the right to use the waters has reverted to the state if waters from any artesian basin are wasting by reason thereof and authorizes the State Engineer or the Artesian Conservancy District in which the well is located to abate such nuisance in a summary manner without notice to the owner by plugging or otherwise. So much for the statutes.

In stating in the first paragraph of this opinion the question for decision, we perhaps have gone beyond the very narrow issue upon which the matter seems to have been ruled below and have posed the more fundamental one of the extent of the right of an artesian conservancy district to conserve the waters of the artesian basin constituting the source of supply for its users, where such waters are tapped beyond its territorially defined boundaries. In the court below, as well as here, it seems not to have been nor to be seriously questioned that, but for the dismissal out as plaintiffs of all the actual landowners and appropriators to beneficial use of waters of the basin, the complaint would have stated a cause of action. Nevertheless, because the district owned no land being serviced by the waters of the basin nor any water right on its own, it was thought by the defendant and the trial court as well not to be the real party in interest and hence not a proper party plaintiff.

Under the provisions of 1941 Comp. § 77-1311 (L. 1931, c. 97, § 11), when the district is organized, it becomes a political subdivision of the state and a body corporate, with power "to sue and be sued" and "to do and perform all acts * * * expressly authorized, and all other acts necessary and proper for carrying out to all intents and purposes the objects for which the district was created, and for exercising the powers with which it is invested."

One of the prime objects for which the plaintiff was organized, as expressed both in the title of the enabling act and in the first and as well in several succeeding sections, is "to conserve" the waters of the artesian basin which supplies water to the

users of the district. In so far, therefore, as the plaintiff's right and competency to maintain the suit is concerned, what was said in Carlsbad Irrigation District v. Ford, 46 N.M. 335, 128 P.2d 1047, 1050, in disposing of a similar challenge to the district's standing as a party plaintiff, applies with equal force and pertinency, to the challenge here made.

The court said:

"Errors assigned by appellants are eight in number, and are argued in the briefs under designation as points. The first is that plaintiff is not a proper party to maintain this suit.

"The pleadings, findings and decision of the trial court disclose such a relationship between the plaintiff and the Government of the United States, which had an interest in the right to use the waters involved, and the land owners who are the beneficial users of the water, and for whose benefit plaintiff was organized and maintains its existence and service, and to whom it owed a duty of impounding, preserving and distributing the water involved, that we conclude as did the district court that the plaintiff was a proper party to maintain this action."

Decisions from other jurisdictions lend support to the conclusion we reach on plaintiff's right to maintain the present suit. See Coachella Valley County Water Dist. v. Stevens, 206 Cal. 400, 274 P. 538; Salt River Valley Water Users' Ass'n v. Norviel, 29 Ariz. 360, 241 P. 503; Oregon Const. Co. v. Allen Ditch Co., 41 Or. 209, 69 P. 455, 93 Am.St.Rep. 701; Caviness v. La Grande Irr. Co., 60 Or. 410, 119 P. 731; United States v. Tilley, 8 Cir., 124 F.2d 850.

In Coachella Valley County Water Dist. v. Stevens, supra, the Supreme Court of California dealt with the precise question now before us. The defendant was sinking wells tapping the artesian basin in which the water users within the plaintiff district claimed superior rights. The district, as a plaintiff, was asserting that right for them in seeking to enjoin the defendant. Its capacity and right to do so was challenged and sustained. One of the chief duties of the plaintiff district was "to conserve water for future use." [206 Cal. 400, 274 P. 541] Among other things, the court said:

"In the present case we think it indisputable that the power conferred on a county water district to sue and be sued with respect to the preservation and conservation of the sources of water supply used and usable for the lands and inhabitants within the district is directly in line with the objects of the creation of the district and germane to the purposes for which it was organized. The power to sue and be sued has been conferred upon numerous public corporations of this character and the conferring of such power without specific mention thereof in the title of the acts has not, so far as we have discovered, ever been successfully brought into question. * * *

"Furthermore, we find no objection in providing in the body of the act without specific mention thereof in the title for the prosecution of proceedings to prevent interference with or diminution of the natural

flow of any stream or subterranean water supply used or useful for any purpose of the district or a common benefit to the lands within the district or its inhabitants. *One of the express purposes of the act is to conserve water for future use and to preserve water and water rights. The fact that the district as such does not assert title in itself to any of such rights is of no consequence, if it has the power to proceed in a representative capacity to protect the rights of all of the landowners and other users of water in the district. And this power the district unquestionably possesses not only under the clear provisions of the act but under well-recognized principles of equity jurisprudence."* (Emphasis ours).

It is true that the language conferring statutory authority to sue in the California case is more explicit than any to be found in the act before us. Nevertheless, unless we are prepared to confine the meaning of the word "conserve" to plugging or repairing leaky wells, the language found in Section 11 of the act, 1941 Comp. § 77-1311, conferring upon the district the power "to sue and be sued * * * and to do and perform all acts herein expressly authorized *and all other acts necessary and proper for carrying out to all intents and purposes the objects for which the district was created"* (emphasis ours), affords ample statutory authority to support plaintiff's maintenance of the present suit. Webster's New International Dictionary (2d Ed.) defines the verb "conserve" as meaning "to keep in a safe or sound state; to save, to preserve from change or destruction." Synonyms are listed under the definition as "maintain," "sustain," "uphold," "defend," "protect," "guard," "shield" and "secure." See, also, United States v. Mammoth Oil Co., D.C., 5 F.2d 330, 351, and Hill v. Bank of San Pedro, 41 Cal.App.2d 595, 107 P.2d 399. In United States v. Mammoth Oil Co., supra [5 F.2d 331], the court declared the meaning of the word "conserve" as found in an act of Congress, in the following manner, to-wit:

"Act June 4, 1920 [34 U.S.C.A. § 524], directing Secretary of the Navy to take possession of properties within naval petroleum reserves, and conserve, develop, use, and operate them in his discretion, directly or by contract, lease, or otherwise, and use, store, exchange, or sell the products, uses the word 'conserve' in its larger meaning of saving from loss, and not in its more limited meaning of holding in the ground, and thereunder the Secretary may conserve, develop, use, and operate all at the same time, and may use, store, exchange, and sell, or any of them, in his discretion, in carrying out the general purposes of the act."

We likewise think that the word "conserve" as found in our statute is used in the sense of saving or preserving from loss. In describing the nature of the improvements to be made by the district, specific means of conserving are mentioned permissively in form in the statute itself, such as plugging or repairing leaky wells and declaring a public nuisance all wells found to be wasting the artesian waters with authority in the directors to go upon any

lands for the purpose of abating such nuisance by plugging or repairing the well. The title of the act, L. 1931, c. 97, provides for the creation of Artesian Conservancy Districts "for the purpose of conserving the waters in artesian basins." The first section emphasizes this basic thought by declaring "the purpose of this Act is to provide for the organization of Artesian Conservancy Districts to conserve, where necessary, the waters in any artesian basin or basins within the state."

It would seem an anomalous construction that confined the district in executing such a fundamental purpose to repairing and plugging leaky wells through which water was flowing in a small stream and yet denied it the power to enjoin the maintenance of an unlawfully drilled well tapping the basin through which water gushed in a torrent—in other words, to say the district could conserve and stop wastage by placing a finger in the leak but could not dam the flood in carrying out the same overall purpose. Truly, the 1941 legislature took no such narrow view of what "conserve" means when, as commented upon later, it enacted L. 1941, c. 98, among other things, authorizing artesian conservancy districts, by formal protests and objections before the State Engineer, to initiate opposition to the drilling of additional wells tapping the waters of their basins. And, if we may resort to analogy, it impresses us as an impractical and unrealistic view to ascribe to the legislature an intention to make a nice distinction between common law waste and trespass in their relative effect in keeping "in a safe or sound state" or "preserving from change or destruction" that which the district is admonished to conserve, since the wrongful act whether committed by a waster or a trespasser has exactly the same damaging effect. Cf. Roots v. Boring Junction Lumber Co., 50 Or. 298, 316, 92 P. 811, 818, 94 P. 182; 1 Foundations of Legal Liability (Street) 33.

It may fairly be assumed that when our legislature enacted L. 1931, c. 97, the enabling act under which the plaintiff was organized, it was familiar with the provisions of our code of civil procedure declaratory of the equity rule permitting one or more to sue or defend for the benefit of the whole number when the question involved is one of common or general interest to many persons, or where the parties are numerous and it is impracticable to bring them all before the court. 1941 Comp. § 19-601. Cf. § 19-101 Rule 23. In Bliss on Code Pleading, 3rd Ed., 126, § 79, the author writes concerning this code provision, as follows:

"Mr. Story (Story's Equity Pleading, (10th Ed.) § 97) classifies the cases where it is applied to equity pleading under three heads:

" 'First, when the question is one of common or general interest and one or more sue or defend for the benefit of the whole; *second, where the parties form a voluntary association for public or private purposes, and those who sue or defend may fairly be presumed to represent the rights and inter-*

*ests of the whole;* third, where the parties are very numerous, and although they have, or may have, separate and distinct interests, yet it is impractical to bring them all before the court.' These *three* classes are included in the two named in the statute." (Emphasis supplied.)

While the plaintiff district is a corporation rather than a voluntary association, its creation resulted from the voluntary action of the interested water users within the district and the legislature may very well have felt that it conferred no extraordinary power on the corporation (as indeed it did not) in the matter of suing or defending, in constituting it an agency authorized to do on behalf of all the water users within the district what anyone of them suing for himself and others similarly situated might alone do, even though all would be bound by the judgment rendered. Cf. Floersheim v. Board of County Commissioners, 28 N.M. 330, 212 P. 451. Indeed, many considerations, personal or financial, such as slightness of the injury to a single water user as compared with the expense of redressing it, and others, might restrain him from moving to sue or defend in a matter of common and general interest to all, where a district acting through its governing board would be more alive and alert to a situation calling for action.

The courts of sister states have employed by way of analogy this and other pertinent provisions of the code of civil procedure, common to their own as well as our statutes, in arriving at the result we reach.

Coachella Valley County Water Dist. v. Stevens, supra; Caviness v. La Grande Irr. Co., supra; see, also Salt River Valley Water Users' Ass'n v. Norviel, supra, and United States v. Tilley, supra. Our 1929 Comp. §§ 105-103 and 105-104, substantially adopted as a District Court Rule in 1941 Comp. § 19-101, Rule 17(a), requires that every action be presented in the name of the real party in interest but in the very same section excepts from the requirement actions prosecuted pursuant to the next succeeding section. The latter provides that the trustee of an express trust, or a person expressly authorized by statute, may sue in his own name without joining his cestui que trust.

In Coachella Valley County Water Dist. v. Stevens, supra, commenting on these various statutory provisions, the Supreme Court of California said:

"Conceding properly, as the defendant does, that an action would lie on behalf of each landowner in the district to protect his individual right, it would necessarily follow that under section 382 of the Code of Civil Procedure one might sue for the benefit of all. See Miller v. Bay Cities Water Co., 157 Cal. 256, 288, 107 P. 115, 27 L.R.A.,N.S., 772. It is true that section 367 of the same code provides that every action must be prosecuted in the name of the real party in interest but the same section excepts actions prosecuted as provided in section 369 of the Code of Civil Procedure. The last section referred to provides that a person *expressly authorized by statute* may sue

without joining with him the persons for whose benefit the action is prosecuted. The county water district act expressly authorizes the present action and any final determination therein would necessarily bind the parties for whose benefit it is prosecuted. Furthermore, no good reason has been suggested why, under the authority of the statute, the landowners and other water users in the district may not set up such a governmental agency to act in a representative capacity in their behalf. In our opinion they have done so and having done so they will necessarily be bound by the result of the litigation."

This Court applied certain of these statutes under similar circumstances by way of analogy where it appeared, as in the case at bar, that all those represented by the plaintiff had a common or general interest in the subject matter of the suit. La Luz Community Ditch Company v. Town of Alamogordo, 34 N.M. 127, 279 P. 72. The plaintiff's right and competency to maintain the suit must be upheld.

Having thus disposed of the challenge made below and found the trial court in error, after directing entry of an order reversing and remanding the cause for a new trial, we might very well rest from our labors. Our inspection of the record fails to establish convincingly what view the trial court may have entertained upon the larger question here presented and made the basis of practically all argument contained in the briefs of counsel, viz., the control, if any, of an artesian conservancy district over waters of the artesian basin underlying the territory embraced within the district where such waters are tapped by a well located beyond the territorial boundaries of the district. Possibly, had not the trial court erroneously concluded that the plaintiff district was not the right party to raise the question, upon proper proof it might have awarded to plaintiff the injunctive relief it sought under the complaint filed. On the other hand, persuaded by the claim of defendant that the plaintiff was without power to interfere because defendant tapped waters of the basin by a well outside the territorial boundaries of the district, the court might have denied such relief. We simply cannot say with any degree of assurance what it would have done.

There is a bare possibility that the trial court may have ruled on this question (and adversely to plaintiff) in view of its finding No. 1 included in the order dismissing the complaint. This finding recites that defendant's well is outside the territorial boundaries of the district. Be this as it may, in view of the public importance of the question, particularly in the artesian belt of the state, and more especially because a present declaration of our views on the subject may avoid a second appeal following a new trial, we have concluded to express ourselves now.

Unless an artesian conservancy district organized under the Act in question possesses and can exercise the power here sought to be invoked, then the purpose of its creation is substantially curtailed. A care-

ful consideration of applicable statutes reviewed at some length hereinbefore, satisfies us that if the defendant's well has tapped waters of the artesian basin underlying the territory embraced within the boundaries of the district, it is wholly immaterial that the defendant drilled it outside such territorial lines.

■■ It would serve no useful purpose again to undertake a discussion of the status in our law of the waters of underground streams, channels, artesian basins, reservoirs or lakes, having reasonably ascertainable boundaries. That has been so well done in the able and illuminating opinion prepared for the court by Mr. Justice Watson in the case of Yeo v. Tweedy, 34 N.M. 611, 286 P. 970, 974, that a mere reference to the case will bring the reader in touch with the sound reasoning by means of which the court charted the future course in this state for the administration of subterranean waters subject to appropriation. This thought stands out in the opinion and holding of the court, namely, that legislative enactments classifying such waters as public and subject to appropriation are merely declaratory of the state of the law prior to such legislation and that except for any differences compelled by their subterranean character, such waters are affected with all the incidents of surface waters as to use, appropriation and administration. As we there said:

"* * * the same reasoning which, upon the premise of riparian rights in running streams, leads to correlative rights in arte-sian waters, will, on the premise of prior appropriation of the waters of running streams, lead to the same basis of right in the waters of artesian basins."

So viewed then, and conceding the plaintiff's competency to invoke the remedy sought, as we have held, whence comes defendant's right to take and use waters previously appropriated, as alleged by plaintiff, to beneficial use by the water users of the plaintiff conservancy district? The mere fact that water might flow by his land in a defined channel near the headwaters of a surface stream, certainly would give him no right as a riparian proprietor, to the use of such waters, if landowners farther downstream previously had appropriated to beneficial use all available unappropriated water of the stream. Does it matter that the water is underground, if the same situation prevails as to its use and prior appropriation by others? We think not.

■ In effect, the defendant here asserts the right of a surface owner to a priority of use and right in underground waters, a contention ignored and repudiated in Yeo v. Tweedy, supra. Even if defendant's well does not tap waters of the artesian basin underlying the plaintiff district, he was without right to drill it except under a permit from the State Engineer as required either by L. 1931, c. 131, or by L. 1935, c. 43, if it was to tap the waters of some underground stream, channel, artesian basin, reservoir or lake, having reasonably ascertainable boundaries. Admittedly, he had no such permit.

■ It seems obvious that L. 1935, c. 43, was enacted to tighten the control of the State Engineer over artesian waters of the state not already placed under control of some artesian conservancy district organized pursuant to L. 1931, c. 97. Yet even as to them, he shares with such districts concurrent jurisdiction to enforce the regulatory provisions of the 1935 Act and to intervene in any suit by or against the conservancy district where necessary for the proper protection or adjudication of rights to public waters of the State. 1941 Comp. § 77-1202, L. 1935, c. 43, § 2. The fact that the State Engineer has not seen fit to seek intervention in the case at bar suggests a view entertained by him that the State's interest in public waters of the artesian basin will be properly safeguarded through the plaintiff district, the party the more immediately concerned and charged by the Act giving it life with the obligation "to conserve" such waters.

As already indicated, the fifteenth regular session of the Legislature evidently considered that to prevent the unauthorized drilling of wells tapping waters of an artesian basin was one means of conserving the waters thereof for by L. 1941, c. 98, § 3 (1941 Comp. § 77-1324), it expressly enacted:

"That any artesian conservancy district which has heretofore been organized, or may be hereafter organized, as provided by law, shall in addition to the powers granted to such districts have the right, power and authority to protest or object to any appli-

cation made to the state engineer to appropriate any waters included within the boundaries of such conservancy district which may be subject to appropriation as provided by law, * * * and such district shall have the right to appeal to the district court from the decision of the state engineer within the time and manner provided by law for appeals from such decisions."

■ If, as required by the statute, the defendant had filed an application to drill a well tapping the waters of the artesian basin and the district had then sought to maintain this action, he might have contended that the procedure mentioned in 1941 Comp. § 77-1324 (L. 1941, c. 98, § 3) is exclusive. But, regardless of whether the plaintiff may have chosen to present in such a proceeding the questions upon which issue is here joined, where defendant has ignored the statute and thus denied the district an opportunity to avail itself of the statutory protest, it does not lie in his mouth to assert, nor can it be successfully maintained, that equity is powerless in the premises. Cf. State ex rel. Stephens v. State Corporation Comm., 25 N.M. 32, 176 P. 866.

■ As a matter of fact, if defendant's well taps waters of this basin, then the land upon which he drilled it is of a kind expressly ordered by the enabling act to be included within the territorial boundaries of the district. Section 2 (§ 77-1302) provides that any conservancy district organized pursuant to the Act "shall include all lands

overlying any such artesian basin and *any lands outside the boundaries thereof* upon which waters from such basin are being used, either for \* \* \* domestic or irrigation purposes, or otherwise." (Emphasis ours.) Again in Section 13, § 77-1313, quoted supra, specific directions are laid down for the Commissioners to include in the district all property which within four years has received some benefit from artesian waters of the district, or *may be benefited* in some degree by improvements of the district. Benefit to the land is made the test of inclusion and the section declares that "property benefited" by the artesian waters is to include property upon which water from the basin is, or may be used for irrigation, domestic, public or commercial purposes. In the face of these statutory mandates, can the neglect, oversight or inadvertance of the Commissioners in omitting lands overlying some part of the basin, deny to the district the power, or relieve it of the statutory duty, to restrain acts on such land which are calculated to diminish or deplete the waters of the basin?

▮▮▮ The defendant asserts the omission of lands of the kind described has exactly that effect. We think otherwise. Just as the tiniest rivulet far up the mountainside is drawn within the orbit of control and administration of the larger stream system of which it forms a part, so wherever tapped, on lands territorially within or without the outboundaries of the conservancy district organized to conserve the waters of such basin, the waters tapped, if in fact waters of such artesian basin, are subject to conservation by the district and, within statutory limits, to the supervision and control of its governing board.

We conclude that the trial court erred in dismissing the plaintiff's complaint. The judgment will be reversed and the cause remanded with directions to the trial court to set aside such judgment, award a new trial, and for further proceedings consistent with the views herein expressed.

BICKLEY and LUJAN, JJ., concur.

BRICE, Justice (dissenting).

The act under which appellant was incorporated does not authorize the institution of this action. The power given to conserve the water of the artesian basins was not intended by the legislature as authority to prosecute suits, the effect of which is to try title to valuable property rights, none of which appellant owns or has authority to own. The character of conservation is indicated by the following excerpt from Sec. 18 of the Act (Ch. 97 N.M.L.1931):

"\* \* \* The improvements to be made shall be such as are calculated to accomplish the objects for which the district was created, and may include the plugging of all Artesian wells within the district found, by tests, to be materially leaking, or wasting the waters of the Artesian basin, as aforesaid; provided, however, where any such well is being beneficially used, the same shall not be plugged without the written consent of the owner thereof. All such ar-

tesian wells found to be wasting the waters of the artesian basin, as aforesaid, are hereby declared to be a public nuisance, and the Directors of the district, and those under their authority, shall have the right and authority to go upon the lands, upon which any such well is located, to abate such nuisance by plugging or repairing any such well. The Directors may proceed to carry out the improvements so outlined in such manner as shall be deemed to be for the best interest of all concerned, but shall cause all artesian wells found to be wasting said waters, and which have not been beneficially used for more than four years, to be first plugged."

There is nothing in the act to indicate that the district's authority extended further than protection against waste. The fact that it could sue and be sued did not give it the general power to sue in behalf of property owners, any one of whom may institute actions in his own behalf, and in behalf of all others similarly situated. The majority cite no authority that supports their opinion. The case of Coachella Valley County Water Dist. v. Stevens, 206 Cal. 400, 274 P. 538 (the only similar case), is not in point because the California district was given specific authority to bring such actions; assuming such authority could be given consistently with constitutional inhibitions. The authority given such districts by the California act, St.1923, p. 312, is as follows:

"To store water for the benefit of the district; to conserve water for future use; to appropriate, acquire and conserve water and water rights for any useful purpose; to commence, maintain, intervene in and compromise, in the name of the district, and to assume the costs of any action or proceeding involving or affecting the ownership or use of waters or water rights within the district used or useful for any purpose of the district or a benefit to any land situated therein; to commence, maintain, intervene in, defend and compromise actions and proceedings to prevent interference with or diminution of the natural flow of any stream or natural subterranean supply of waters used or useful for any purpose of the district or a common benefit to the lands within the district or its inhabitants; and to commence, maintain and defend actions and proceedings to prevent any such interference with the aforesaid waters as may endanger the inhabitants or lands of the district."

It is interesting to note that Justice Curtis dissented, expressing the view that the opinion of the District Court of Appeals (266 P. 341) which held that as the district had no interest in the use of the water underlying the district and owned no land with water rights therein, that it was not authorized to bring the action, notwithstanding the statute. If it can be said that the California district had authority to prosecute such action because specifically given it by the legislature of that state, I answer that no such authority was given to the appellant here, nor did the legislature have in mind the granting of such broad powers.

Carlsbad Irrigation Dist. v. Ford; Salt River Valley Water Users' Ass'n v. Norviel; Oregon Const. Co. v. Allen Ditch Co.; Caviness v. La Grande Irrigation Co., and United States v. Tilley, all cited in the majority opinion, are cases in which irrigation districts, having the authority and duty to impound and distribute water to its water users, necessarily were held to have authority by legal proceedings to protect such rights against trespassers, though the effect was to protect the rights of their water users. The appellant has not the remotest interest in the artesian water involved. The appellee is not wasting water, but is applying it to a beneficial use. It is a matter of general public knowledge that the purpose of the act was to prevent waste by plugging or repairing leaky wells; and not to determine the right to the use of water.

Let us assume that upon remand and trial the district court will find that appellant has not established by substantial evidence that the water flowing from appellee's well comes from either of the artesian basins underlying the territory covered by appellant district. If so, will the interested landowners be bound by such decree? According to the majority opinion they will be so bound, although not parties to the suit. The legislature never intended to give to the district any such authority, if indeed it could. The judgment of the district court is correct and should be affirmed.

MABRY, C. J., concurs.

On Motion for Rehearing.

SADLER, Chief Justice.

The defendant's motion for rehearing has been argued orally and in addition to being supported by his own brief, it has the support of an extensive brief filed with our leave by amicus curiae who also participated in the oral argument in support of the motion. Thus it is that even if the motion shall draw a formal denial, as a matter of fact, it has been considered as if upon a rehearing of the entire case. Such reconsideration leaves us still of the opinion that the result announced is correct, which calls for a denial of the motion, although there are certain matters we desire to clear up in disposing of same.

Amicus curiae correctly reminds us of error in our statement in the opinion on file that the land on which defendant drilled his well was never within the territorial boundaries of the plaintiff district unless the State Engineer's order, made subsequent to such drilling, placed it there. What should have been said was that this land was never within the territorially defined boundaries of the artesian *basin* unless action by the State Engineer, subsequent to the drilling, placed it there. Somewhat indiscriminate use of the terms "basin" and "district" in the brief of plaintiff-appellant accounts for the misstatement. The unimportance of this inaccuracy is disclosed by the fact that throughout our opin-

ion it was taken as an admitted fact that the site of defendant's well was never within the territorial boundaries of the *district*. Likewise, its presence outside the defined boundaries of the basin, when drilled, if actually it taps the waters of such basin, where previous applications to beneficial use by water users of the district have exhausted the supply available for appropriation, as we shall show, also lacks decisive importance.

We already have held in the opinion filed that the mere fact defendant's well was drilled outside the territorial boundaries of the district does not deny it the right to enjoin maintenance of same if the well taps waters of the artesian basin underlying the district to the detriment of its water users whose previous applications to beneficial use have combined to exhaust all waters of the basin available for appropriation. True enough, when we so held we were under the impression that at the time defendant drilled his well the same was within defined boundaries of the basin, thus requiring a permit from the State Engineer to render lawful the drilling under the provisions of L.1935, c. 43, 1941 Comp. § 77-1201 et seq. Furthermore, we employed arguendo in support of our conclusion that preventing an unlawful taking of the fully appropriated waters of an artesian basin was to "conserve" the same within the meaning of that term as employed in the enabling act, as much so as preventing "waste" through leaky wells, the action of a subsequent legislature, L.1941, c. 98, § 3, 1941 Comp. § 77-1324, in authorizing conservancy districts to protest before the State Engineer applications for drilling new wells to appropriate waters of the district.

It now appearing that defendant's well, when drilled, was not within the defined boundaries of the artesian basin supplying water users of plaintiff district, no permit was necessary to render lawful the drilling and, hence, a protest by plaintiff prior to discovery that the well actually tapped the basin would have been untimely and out of order. The inquiry naturally follows: Does the erroneous assumption in our opinion that defendant's act in drilling without a permit was unlawful dictate a result contrary to that announced by us? This question is to be answered by determining what effect, if any, discovery that defendant violated no law in drilling can have on the plaintiff's competency to sue to enjoin an unlawful depletion of the district's water supply for its users. The answer can only be—no effect whatever. The important fact in connection with any new drilling, particularly as respects an interest on the part of the plaintiff which will give it a right to sue, is always: Will it tap waters of the basin supplying users in the district? Presumptively, it will, if drilled

within defined boundaries of the artesian basin underlying the district, whether within or outside territorial boundaries of the district and, hence, a permit must be secured to give legality to the drilling. But, even though drilled outside the defined boundaries of an artesian basin and without a permit, since in such case none is required, once it is established that the well has tapped waters of the basin a conservancy district was created to conserve, the latter's right to sue arises instanter and automatically. It may lose on the facts, as for instance by proof that there are surplus waters subject to appropriation, thus disproving detriment or injury to plaintiff's water users, but defeat cannot be predicated on a lack of competency to sue on plaintiff's part.

These conclusions are as simple as A-B-C unless boundaries originally established for an artesian basin are to be deemed "frozen" for all time by a conclusive presumption that they embrace all lands overlying any part of the basin, a result contemplated by the statute, 1941 Comp. § 77-1302, yet truly seldom, if ever, actually the case. That the latter is true is abundantly demonstrated by the admission of defendant's counsel at oral argument of the motion for rehearing that the State Engineer has been endeavoring to keep up with events by extending defined boundaries of the basin, from time to time, to embrace lands shown by subsequent drillings of third parties to lie over portions of the basin.

Counsel for defendant refer arguendo to 1941 Comp., § 77-1208, L. 1935, c. 43, § 8, which provides for summary abatement as a public nuisance, after notice, of wells wasting water at the surface, and authorizes the State Engineer, artesian well supervisor, or artesian conservancy district, "if the well is situated therein," to fit the well with valves or other devices to stop the waste, constituting the cost thereof a lien on the land where the well is situated and any other land entitled to use water from the well. The quoted language, say counsel, indicates a legislative intent to confine the district within its territorial boundaries in its efforts to conserve waters for its users. But a very good reason, applicable to the conservancy district, but not to the State Engineer and artesian well supervisor, properly limits the district's right thus to abate, summarily, to wells within its territorial boundaries.

▮ It is to be noted that the cost of abating fixes itself as a lien on the land. Now unless the well whose waters are wasting actually taps the basin supplying the district's users, a decisive issue yet to be tried out in the case at bar, the district would be utterly lacking in statutory interest or concern in the matter of such wastage. Accordingly, where the well is outside its territorial boundaries this statute denies it the right to abate wastage in a summary manner. It must, as it has

done here, first test its rights in the premises by appeal to the courts. Not so, as to the State Engineer or an artesian well supervisor acting under his direction pursuant to regulations prescribed by him, 1941 Comp. §§ 77-1203 and 77-1204, in territory outside artesian conservancy districts but within an artesian basin. It is the concern of the State Engineer, certainly, to stop wastage whether it affects waters within or without the territorial boundaries of an artesian conservancy district, yet within the boundaries of an artesian basin theretofore defined by him. Hence, the significant use of the language now underscored appearing in such statute, viz., "such officials *having jurisdiction* may abate such nuisance," etc. (Emphasis ours.)

The exact nature or extent of defendant's claim to underground waters has been somewhat obscure prior to the filing of his brief supporting rehearing, although in our opinion filed we said that, in effect, he here asserts the right of a surface owner to priority of use and right in such waters, a contention repudiated in Yeo v. Tweedy, 34 N.M. 611, 286 P. 970, as we pointed out. That we were substantially correct in our appraisal of his claim is demonstrated by the proposition now boldly urged in brief supporting his motion that waters discovered outside boundaries of underground streams, channels, artesian basins, reservoirs or lakes, there-

tofore defined by the State Engineer, are subject to "unregulated appropriation" and are "without his (the State Engineer's) jurisdiction." It may be granted, as already conceded, that no permit is necessary for drilling in such territory. But it does not follow that, where such well taps waters of an artesian basin or other underground stream whose available supply already has been exhausted by prior appropriations, the well owner acquires a valid right to the use of such waters as against the body of prior appropriators. Unless we blind ourselves to the migratory character of waters, whether surface or underground, one often will be able to tap same outside the defined—and where they do not exactly coincide, outside the natural—boundaries of underground streams, artesian basins or lakes, making their way into them. Waters within such boundaries would have to be inexhaustible to prevent a taking by anyone from a source supplying the underground basin or stream from diminishing the supply available to those having prior rights to waters within the same.

Certainly, unless we desire to invite chaos in the administration of underground waters, *somebody* has authority to enjoin a trespass of the kind just mentioned. But, say counsel for defendant, the conservancy district concerned may not (1) because without right to sue at all in such behalf and (2) because the well

is beyond its surface boundaries. The State Engineer may not, they say, because of defendant's right to "unregulated appropriation," putting the matter "without his jurisdiction," the well having been drilled beyond his previously defined boundaries of any underground stream, artesian basin or lake. And, by the same token, a water user who is a prior appropriator may not enjoin, because of defendant's right to "unregulated appropriation," even though it be conceded the questioned well taps the artesian basin or lake supplying him, all of whose waters already have been applied to beneficial use by prior appropriations. We are unable to sustain a claim so astounding!

It is also complained in the defendant's brief supporting motion for rehearing that our opinion goes far beyond the sole question tried below, viz., the plaintiff's competency to sue "and has inferentially determined at least, other issues which were raised by the pleadings, but never heard and determined by the trial court, and in support of which no evidence or proof was offered." We pointed out in our opinion how difficult it was to determine exactly what the trial court did decide. Its sole finding of fact was that the Peters well was outside the territorial boundaries of the district. It then concluded the conservancy district was not a proper party plaintiff and dismissed its suit. But the presence of the well outside the boundaries of the district is not a matter going to the competency of the plaintiff to maintain the suit unless the court's ruling rested on the view that this was not a method of conserving waters of the basin committed unto the plaintiff district. If that were true, the same defect in plaintiff's right to maintain the suit would exist, even though the well were located within territorial boundaries of the district. Thus mention of its location outside such boundaries would lose significance.

In this state of confusion as to just what the trial court did decide we imputed to it a holding that the plaintiff was not a proper party plaintiff because seeking to "conserve" waters of the basin in a manner not authorized by the act, as argued by the defendant. In other words, and viewed in this aspect, in effect, we put to ourselves the question: *"Is a governmental agency, created for the declared purpose of conserving the waters of an artesian basin and given power to sue, to be denied the exercise of that power in relation to the primary function it was established to perform?"* We supplied a negative answer to that inquiry. We might have stopped right there. But the trial court had seemingly attached significance on the plaintiff's right to sue to presence of the well outside the district's boundaries—something, as already noted, going to the merits of the case rather than competency of plaintiff to sue. Since we were

having to send the case back for a trial of decisive but undetermined issues, it was deemed appropriate to pass upon this question as well and we did.

There is no language in our opinion to inspire or support the suggested apprehension that under it the conservancy district may be involved in controversies between water users of the district as to existence or priority of their water rights. We tried to make it plain in what was said, and we now reaffirm, that it is only where the water users of the district have a common or general interest in the subject matter of the suit that the district may sue or defend for them in a representative capacity. It is not authorized to adjudicate water rights as between the water users of the district or to take up the fight of one as against the other. We sought to make this clear before and we reemphasize it now.

Exception is taken in the minority opinion on motion for rehearing to language in the majority opinion heretofore filed contrasting loss of water to users of the district through leakage with that to be suffered from an unauthorized well tapping the artesian basin wherein we commented on the definition of the word "conserve" urged upon us by defendant's counsel in this language, to-wit: " * * * in other words, (defining it) to say the district could conserve and stop wastage by placing a finger in the leak but could not dam the flood in carrying out the same overall purpose." The majority are virtually charged with gross ignorance of the true situation in assuming "at least that the waste, including casing leaks, were (was) infinitesimal if compared with the alleged 2000 gallons per minute pumped from the Peters well."

The misapprehension disclosed by the minority opinion in this connection reveals itself in interpreting what we said as comprehending the aggregate loss from leakage over the entire district as "infinitesimal" in comparison with the loss to the district's water users of the entire output of the Peters well. The thought we endeavored to convey (and we think the language does not reasonably bear any other construction) was the incongruity of a legislative intent which would authorize the district to "stop a leak" in a well, the loss from which necessarily is less than the total production from such well, and yet deny it the power to enjoin maintenance of that same well, if unlawfully maintained, the entire production of which was thereby lost to the water users of the district. The criticized language was simply a statement by us of the old equation: It requires the sum of all the parts to equal the whole. Hence, a single part necessarily is less than the whole. Certainly, water lost through a leak in a given well would rarely, if ever, equal its total production. The majority have never for a moment doubted that the aggregate loss to the water users from leaks in all

wells throughout the district is very large. But we still affirm the thought intended and actually conveyed, as we think, by the language employed that the leak in a given well is less than its entire output.

The position of the defense throughout has been that, if loss is occurring through a leak, the district can prevent it but if the entire output of a given well is lost to the district's water users, as one maintained without authority, the district is helpless in the premises—that although enjoined by statute to conserve waters of the basin for the benefit of the water users in the district, to enjoin a taking by trespassers is a method of conservation not contemplated by the legislature when it ordered the district to "conserve" the waters of an artesian basin supplying it. In what has been said, both in our original opinion and in this one on motion for rehearing, we think we have adequately shown that this position is not to be successfully maintained. That it is not to be is further demonstrated by the amendment heretofore adverted to in our former and this opinion, found in L. 1941, c. 98, § 3, 1941 Comp., § 77-1324, giving the word "conserve" the broader meaning we impute to it in the matter of appearing as a protestant before the State Engineer against applications to appropriate artesian waters supplying the district and of prosecuting appeals from his decision to the district court.

The motion for rehearing is not well taken and should be denied.

It is so ordered.

BICKLEY and LUJAN, JJ., concur.

HUDSPETH, J., did not participate in this decision.

BRICE, Justice (dissenting).

The principal question is whether plaintiff has capacity to prosecute this suit. No such express power is granted, as will appear from a later reference to the statutes that authorized its being. The answer to the question will depend upon whether the power was impliedly granted.

The case was tried upon the pleadings, in which there was a meager statement of facts, entirely insufficient to support the conclusion of the majority, as reflected in the two opinions. But the majority opinion assumes a state of facts utterly erroneous, not in the record, or the briefs of the parties, or that remotely resembles the real facts and conditions that induced the legislature to enact ten separate laws for the conservation of artesian water, beginning as early as 1905. It is stated in the original opinion:

"It would seem an anomalous construction that confined the district in executing such a fundamental purpose to repairing

and plugging leaky wells through which water was flowing in a small stream and yet denied it the power to enjoin the maintenance of an unlawfully drilled well tapping the basin through which water gushed in a torrent—in other words, to say the district could conserve and stop wastage by placing a finger in the leak but could not dam the flood in carrying out the same overall purpose."

This imaginary condition had for a basis allegations of fact in substance that defendant had drilled a well outside of the boundaries of the plaintiff district, with the purpose and intent of irrigating therefrom 285.6 acres of land, and that he was pumping from that well 2000 gallons of water per minute for such purpose.

These, and these only, are the simple facts alleged from which the Chief Justice has not only constructed a well "gushing a torrent" but has reduced the loss of water through leaks in well casings and otherwise, to streams that could be stopped with his finger. The statement quoted cannot be justified as figurative, because it assumed at least that the waste, including casing leaks, was infinitesimal if compared with the alleged 2000 gallons per minute pumped from the Peters well; for at the time that opinion was written this court had no information from the facts alleged in the pleadings upon which this case was tried regarding the quantity of water lost through leaks in casings, or otherwise.

Now, it having been determined that "a torrent" of water was "gushing" from the Peters well, and that all waste (including leaks from casings) was negligible, and that the owners of water rights had refused to join in legal proceedings against Peters, it was thought to be the duty of this court to prevent "chaos" and inevitable ruin in the Pecos Valley, to constitute the plaintiff the agent of the water right owners to prosecute actions involving the right to the use of water from the artesian basins against the desire of the interested parties. I do not question the authority of any water right owner to institute such legal proceedings against Peters for himself and all similarly situated; but I deny the authority of this court to interfere with that right by bestowing upon plaintiff, against the will of the water right owners, the authority to prosecute actions to try title to real property in which it has no beneficial interest or title.

The general rule is that public corporations possess and can exercise only such powers as the legislature grants by *express words,* and such additional powers as are necessarily implied from those expressly granted.

" * * * Unless authority can be found elsewhere in the statutes or the Con-

stitution, then it does not exist; for a municipality can do no act for which authority is not expressly granted or which may not be reasonably inferred from those conferred upon it." Barker v. State, 39 N.M. 434, 49 P.2d 246, 248.

"Counties, cities and towns are municipal corporations created by the authority of the legislature, and they derive all their powers from the source of their creation, except where the constitution of the state otherwise provides. They have no inherent jurisdiction to make laws or to adopt governmental regulations, nor can they exercise any other powers in that regard than such as are expressly or impliedly derived from their charters or other statutes of the state." Town of Mount Pleasant v. Beckwith, 100 U.S. 514, 520, 25 L.Ed. 699.

"A municipal corporation, therefore, possesses no powers of faculties not conferred upon it, either expressly or by fair implication, by the law which created it, or by other laws, constitutional or statutory, applicable to it. It is a creature of law established for special purposes and its corporate acts must be authorized by its charter or other laws applicable thereto." 1 McQuillen, Municipal Corporations, 2nd Ed.Rev., Sec. 367.

Also see Atkin v. State of Kansas, 191 U.S. 207, 24 S.Ct. 124, 48 L.Ed. 148; City of Chelsea v. Treasurer Receiver General,

237 Mass. 422, 130 N.E. 397; and Foster v. Waco, 113 Tex. 352, 255 S.W. 1104.

Such organizations are usually judicially designated "quasi-municipal corporations." Davy v. McNeill, 31 N.M. 7, 240 P. 482; People v. Letford, 102 Colo. 284, 79 P.2d 274; Wheatley v. Superior Court, 207 Cal. 722, 279 P. 989.

The powers conferred on public corporations are strictly construed.

"The rule is generally stated that the scope of sovereignty delegated to municipal corporations should not be enlarged by liberal construction. The powers conferred are strictly construed, and any fair, substantial, and reasonable doubt concerning the existence of any power, or any ambiguity in the statute upon which the assertion of such power rests, is to be resolved against the corporation, and the power denied. * * *" 37 A. J., Municipal Corporations, Sec. 113.

From these authorities I conclude that the plaintiff has such powers only as have been expressly granted, and those that may be reasonably inferred from those granted. That it is the duty of this court to construe the grants of power strictly, and to resolve any fair and reasonable doubt regarding its powers against the plaintiff.

A history of the legislation for the conservation of underground water will throw

some light on the legislative intent in providing for the organization of conservancy districts. It is history in this state that the first wells tapping the artesian basin in southeastern New Mexico which produced a flow of artesian water sufficient to irrigate large quantities of land, were constructed about the year of 1903. Very shortly thereafter the people began to agitate the question of the conservation of artesian water. From the legislation that followed in 1905 it may be inferred that defective casing had been used to case wells, some had not been properly set to prevent leaks from the basin into the upper strata. Wells were allowed to flow without beneficial use of the water, etc.

The legislature of 1905, Ch. 17, passed "An Act to regulate the use of artesian wells and to prevent the waste of subterranean flows of water and for other purposes." As the title shows, the subject was waste of artesian water. It was provided that artesian wells should be tightly and securely cased and capped to prevent the waste of water and such waste was declared to be a public nuisance and the owner occupying land suffering such waste was held to be guilty of a misdemeanor. Waste was defined as follows:

"Waste is defined for the purpose of this act to be the causing, suffering or permitting the water flowing in such well to reach any porous substratum before coming to the earth's surface, or to flow from such wells,

unnecessarily upon any land, or directly or indirectly into any river, creek or other natural water course or channel, or into any lake or pond, or into any street, road or highway, unless it be used on lands for beneficial purposes: * * *." N.M.L. 1905, Ch. 17, Sec. 4.

The act required that artesian wells should be cased their entire depth with a good quality of casing set in the rock overlying the artesian basin.

Chapter 64, N.M.L.1909 was entitled "An Act to regulate the use of artesian wells, storage reservoirs and ditches connected therewith, and to prevent the waste of subterranean flows of water, and for other purposes * * *." It was a comprehensive law of 32 sections, enacted to prevent waste of water from artesian wells, either above ground or in the earth above the artesian basin. Waste is defined as follows:

"Waste from artesian wells, for the purpose of this act, is defined to be the causing, suffering or permitting the water in any artesian well to reach any porous substratum before coming to the earth's surface, or to flow from such well unnecessarily upon any land, or directly into any river, creek or other natural water course or channel, or into any lake or pond, or into any street, road or highway, unless to be used on land for beneficial purposes under the constant supervision of the person using such water

or his employee: * * *." N.M.L.1909, Ch. 64, Sec. 5.

The act is much too long to more than state its purposes generally, which are: To prevent waste of artesian water caused by defective casing; prohibiting the flow of water not to be beneficially used; prohibiting the use of wasteful reservoirs and ditches; prescribing the weight of casing; an artesian well board is provided for and its duties prescribed; limitation is made on the use of water; and repairs of leaky wells, ditches and reservoirs are required.

Chapter 81 of the Laws of 1912 is very similar to the act of 1909. The principal addition is authority given the artesian well supervisor to stop waste from leaky reservoirs and wells, and to plug wells when necessary to prevent waste; all at the expense of the land owner.

The artesian well law was re-enacted in 1925, Ch. 101, in substantially the same language as the act of 1912 and the purposes were precisely the same. This act was amended in 1927 in some particulars, Ch. 149, but the purposes of the act of 1925 and the amendments of 1927 were to prevent the waste of artesian water, as waste is defined in the various conservation acts.

These laws were not changed again until 1931. In that year there was enacted the Conservancy District Law, Ch. 97, the law declaring artesian water to be public water, Ch. 131, and Ch. 70, the title to which is as follows:

"An Act Appropriating Money for the Repair and Plugging of Artesian Wells in the Pecos Valley Artesian Water Basins Situated in Chaves and Eddy Counties Where Said Wells are Found to be Wasting the Waters From Said Underground Reservoirs, and Providing for the Supervision of Said Work by the State Engineer."

This act contains the following preamble:

"Whereas, the boundaries of the Artesian Reservoirs, situated in Chaves and Eddy Counties in the Pecos Valley extending southward from above the city of Roswell, have been scientifically and definitely determined; and

"Whereas, all of the waters of said reservoirs have been beneficially appropriated and have been made available by the drilling of several hundred artesian wells, many of which have been in use for a long period of time, and because of the disintegration, or rusting of the casings in many of the same the waters which would otherwise be stored in said reservoirs are finding outlet to the surface through the upper strata of the earth or flowing into porous sub-strata where they cannot be used and thereby materially diminishing the water supply and depleting and destroying the value of the lands irrigated therefrom; and

"Whereas, many of said wells have been abandoned and through said condition the

waters of said reservoirs are being wasted and depleted and it is necessary, in order to permanently establish and conserve the water of said reservoirs for irrigation purposes, that all such wells be repaired or plugged."

The legislature by this act appropriated $20,000 "* * * for the purpose of causing artesian wells in the Pecos Valley Artesian Basin found by the State Engineer to be leaking and wasting the waters from said reservoirs to be plugged or repaired, so as to preserve the permanency of the reservoir or reservoirs and to prevent further waste therefrom."

This was the status of the artesian water conservation law in New Mexico at the time the legislature enacted the laws under which the plaintiff was incorporated. The legislature at the time was informed from the laws it had enacted beginning in 1905, that from the discovery of the large water supply in the artesian basin until that time there had been a great waste of artesian water and that this waste increased with the years, so that in 1931 the causes of waste, as they appear from these laws, were, (1) a larger flow of water from wells than could be beneficially used; (2) wells that were defectively cased so that the water would pass around the casing into the strata above the impervious rock covering it; (3) waste from poorly constructed reservoirs and ditches; (4) the failure to use casing of sufficient strength to hold the water, and (5) the disintegrating or rotting of casing from natural causes.

It is evident from the preamble I have quoted from Ch. 70, N.M.L.1931 that the fifth cause of waste had become so serious a problem as that it endangered the water supply of the artesian basin; that it had become necessary to plug or repair leaky and abandoned wells to preserve the permanency of the artesian water supply. To conserve this water the legislature appropriated $20,000 of state money to be used to pay for the plugging of leaky and abandoned wells.

This court can take judicial notice of the laws of nature and the results of time; and therefore of the fact that iron casing in artesian wells will disintegrate in time, so that after water by its pressure is forced through weak places in the pipe into the strata above the basin, the pressure and disintegration will continue until the entire flow is lost.

The express powers granted to appellant are contained in the original conservancy district act and amendments thereto, Ch. 97 N.M.L.1931; Ch. 98, N.M.L.1941, Secs. 77-1301 to 77-1324 inclusive, N.M.Comp. 1941; and an act relating to artesian wells, Ch. 43, N.M.L.1935, Secs. 77-1201 to 77-1212, N.M.Comp.1941. All of the parts of these acts by which powers are granted to conservancy districts, or which make reference to grants of power, or refer to the

purpose of the legislation, are the following as they appear in the 1941 compilation:

"The purpose of this act is to provide for the organization of artesian conservancy districts to conserve, where necessary, the waters in any artesian basin or basins within the state, the boundaries of which have been scientifically determined by investigations, and where such waters have been beneficially appropriated for private, public, domestic, commercial or irrigation purposes, or otherwise." Sec. 77-1301.

"* * * Upon declaring the district organized, the same shall be a political subdivision of the state of New Mexico, and a body corporate with all the powers of a public or municipal corporation; shall have power to sue and be sued, to incur debts, liabilities and obligations, to exercise the right of eminent domain and of taxation and assessment as herein provided and to do and perform all acts herein expressly authorized, and all other acts necessary and proper for carrying out to all intents and purposes the objects for which the district was created, and for exercising the powers with which it is invested. * * *" Sec. 77-1311.

"After the formation of any artesian conservancy district, it shall be the duty of the board of directors from year to year to outline a plan or program of water conservation and administration, and they shall make an estimate of the cost of adminis-tration, equipment and improvements necessary to carry out such program from year to year, when the cost thereof is to be paid by tax levies.

"In carrying out any such plan or program the board of directors shall have authority to cooperate with the state engineer and the United States geological survey, where such cooperation is offered.

"The program to be carried out and the improvements to be made and the equipment to be purchased shall be designed to accomplish the objects and purposes for which the district was created, and may include the plugging of all wells within the district found by tests to be materially leaking or wasting any waters included in the district. The directors may proceed to carry out the improvements so outlined in such manner as may be deemed for the best interest of all concerned, and may enter into any contracts or do or perform any act or thing necessary or advisable to carry out to all intents and purposes the objects and purposes for which the district was formed, and shall have the right of ingress and egress at all reasonable times to all wells within the district for the purpose of making leakage tests, and otherwise determining that such wells are properly equipped and are being used so as to conserve the waters included in the conservancy district.

"All wells included in the district found to be leaking or wasting such waters, are

hereby declared to be a public nuisance, and the directors of the district and those under their authority shall have the right, power and authority to go upon the lands upon which any such well is located to abate such nuisance by plugging or repairing any such well." Sec. 77-1318.

It is provided by Sec. 77-1319 that the directors shall make up a tax roll including all property in the district and from the value thereof to "determine the tax levy to be made against the same to produce the necessary revenue to make the improvements needed in the district," as provided by Sec. 77-1319.

"Wherever any artesian conservancy district has heretofore been organized or may hereafter be organized, under and pursuant to Chapter 97 of the N.M. Session Laws of 1931, or amendments thereto, such conservancy district may be given the same rights, power and authority as to all underground waters within the boundaries of such conservancy district as have been or may hereafter be conferred upon such district by said legislative act, and amendments thereto, as to artesian waters; provided, however, the boundaries of such underground waters have been reasonably ascertained and the same, or a substantial portion thereof, have been beneficially appropriated * * *." Sec. 77-1322.

"Any artesian conservancy district which has heretofore been organized, or may hereafter be organized, as provided by law, shall in addition to the powers granted to such districts have the right, power and authority to protest or object to any application made to the state engineer to appropriate any waters included within the boundaries of such conservancy district which may be subject to appropriation as provided by law, and to protest or object to any application to the state engineer to change the location of any well or to change the use of waters for any purpose other than that for which originally granted, where it is determined by resolution of the board of directors of such district that the granting of such proposed application would interfere with any existing water rights or program of such conservancy district for the conservation of the waters sought to be appropriated, and such district shall have the right to appeal to the district court from the decision of the state engineer within the time and manner provided by law for appeals from such decisions." Sec. 77-1324.

The artesian well act was amended in 1935 and appears as Article 12, title Artesian Wells, in the 1941 compilation, Secs. 77-1201 to 77-1212.

"All artesian waters which have been declared to be public waters shall be under the supervision and control of the state engineer, as provided by this act, but where artesian conservancy districts have been duly or-

ganized pursuant to chapter 97 of the N.M. Session Laws of 1931 and acts amendatory thereof, such districts shall have concurrent power and authority with the state engineer to enforce the regulatory provisions, as herein provided, in so far as the waters to be conserved and controlled by the respective districts are affected. * * *." Sec. 77-1202.

"The state engineer shall prescribe and enforce reasonable rules and regulations consistent with the terms of this act governing the drilling, casing, repairing, plugging, and abandonment of artesian wells, and, where necessary, may vary such rules and regulations with the varying conditions in the different artesian basins; Provided, however, that the state engineer shall first consult with the board of directors of the artesian conservancy district in any such artesian basin to the end that such rules and regulations shall properly meet the requirements of such artesian basin. * * *." Sec. 77-1204.

"The owner of any artesian well which is being beneficially used or which under existing water rights may be beneficially used, who causes, suffers or permits the waters therefrom after coming to the surface of the earth to waste as herein defined, shall be guilty of a misdemeanor. Such waste is also hereby declared to be a public nuisance, and in the event of the failure or refusal of the owner of the well to abate the same, within ten (10) days from receipt of notice by registered mail, return receipt requested, from the state engineer, artesian well supervisor, or artesian conservancy district, if the well is situated therein, such officials having jurisdiction may abate such nuisance in a summary manner without further notice by properly fitting the well with necessary valves or other devices or doing whatever shall be necessary to control the flow of water therefrom and prevent such waste, and the cost thereof shall be a lien against the land upon which the well is situated, * * *." Sec. 77-1208.

" * * * It shall be the duty of the artesian well supervisor and officials of any artesian conservancy district or agents or employees designated for that purpose to inspect all reservoirs and main ditches and laterals connected therewith as to construction, both as to workmanship and materials used, and to determine the losses therefrom by seepage and evaporation. * * *" Sec. 77-1210.

" * * * The state engineer, artesian well supervisor, or any director of an artesian conservancy district or other officer charged with the enforcement of this act, may file a complaint with the proper official against anyone for the violation of any of the provisions hereof." Sec. 77-1212.

The definition of waste, Sec. 77-1206, is substantially the same as that of the artesian well act of 1927.

It is then provided that if a reservoir shall show a loss of twenty percent that it shall not be used in its defective condition and any use thereof "shall be deemed a misdemeanor, punishable as provided in this act, and also a public nuisance, and the state engineer, artesian well supervisor or artesian conservancy district having jurisdiction, may abate such nuisance in a summary manner." Sec. 77-1210.

The general power granted to conservancy districts is the power to conserve artesian water.

The word conserve has a number of meanings. It is defined as follows: "To keep in a safe or sound state; to save; to preserve from change or destruction." Webster's International Dictionary. "To keep in a safe or sound state, to save; preserve from loss, decay, waste or injury." Webster's 20th Century Dictionary.

It is obvious that the legislature did not mean that the water should be kept in a safe or sound state, or that it should be saved or that it was to be preserved from change. The only definition that could apply when the element to be conserved is water held for beneficial use is "to preserve from loss or waste." Irrigation water does not change, nor is it destroyed. It does not decay nor is it subject to injury.

That this was the meaning intended by the legislature is shown by a series of acts passed for the conservation of artesian water, as I have shown; also by the specific powers granted to plaintiff, each of which is authority to prevent waste as waste had been defined in every act theretofore passed. The specific powers granted by the statutes quoted are as follows:

To make leakage tests; to plug or repair leaking wells, Sec. 77-1318; concurrent power with the state engineer to enforce rules and regulations of the state engineer governing the drilling, casing, repairing, plugging and abandoning artesian wells, Secs. 77-1202 and 77-1204; to prevent waste of artesian water after it comes to the surface of the earth, Sec. 77-1208; to inspect reservoirs and ditches and prevent waste therefrom, Secs. 77-1206 and 77-1210; and to enforce the conservation of water by filing criminal complaints, Sec. 77-1212.

These are exactly the powers conferred upon the various state agencies for the conservation of artesian water by laws passed prior to the enactment of the conservancy district act.

The legislative history of water conservation shows beyond a doubt that the waste of artesian water had become so menacing, particularly that from leaky wells, that the legislature justified an appropriation of $20,000 of public money to

be used for plugging such wells by saying that

"* * * through said condition (waste from leaky wells) the waters of said reservoirs are being *wasted and depleted and it is necessary* in order, to permanently establish and *conserve the water* of said reservoirs for irrigation purposes, that all such wells be repaired or plugged." (My emphasis.)

The legislature did not appropriate $20,000 out of public funds and authorize the expenditure of many thousands more to be collected as' annual taxes, to stop a mere "trickle" of water, so insignificant that the pressure of a finger would stop it.

I have hesitated to refer to the history and public knowledge of the people of the Fifth Judicial District regarding the waste of artesian water over a period of more than forty years; but I assume if there is doubt about our judicial knowledge of these facts, that it is not out of place in answer to the assertion that the loss of water through leaky well casings was insignificant, or a mere "trickle."

Through the public press, word of mouth and public records of scientific investigation made at the expense of the United States and the state, it has become common knowledge in the Fifth Judicial District at least, that to 1926 there had been drilled about 1500 artesian wells in the Pecos Valley; that of these, the plaintiff has plugged nearly one half, because the waste of water through defective or disintegrated casings was so great that it had become a menace to the artesian water supply. It may be assumed that many more wells should be plugged, and that the casing of every artesian well will rust out in the course of time, and its flow of water will ultimately be lost in the upper strata unless plugged. Many new wells have been drilled to replace those plugged, to preserve existing water rights.

Scientific investigation of the artesian water supply in the Pecos Valley was made by Albert G. Fiedler of the U. S. Geological Survey, beginning in 1925. To assist in securing data for conserving the waters of the artesian basin this state appropriated the sum of $5000 to be used by the state engineer in connection with the work of the U. S. Geological Survey. Voluminous reports were made in 1926, 1928, 1930 and 1933, which are public records in the office of the state engineer. In one of these reports it is stated, among other things:

"Underground leakage from wells may in some sections form a *larger portion of the draft* upon the artesian reservoir and without proper steps to remedy such losses the artesian supply may be *completely dissipated*." (My emphasis.)

The loss of water through leaky casings had reached, not millions, but *billions* of gallons annually at the time the plaintiff

was organized to conserve this water. This mere "trickle" was depleting the water supply and seriously injuring a great industry.

The contention of the majority is that the power to "conserve" artesian water granted to plaintiff, constitutes it the agent of all the water right owners of the district to prosecute suits to determine title of claimants to the right to use water from wells drilled outside the boundaries of plaintiff district; and I assert that its authority is limited to the prevention of waste of artesian water.

The language of the statute should be construed in the light of its historical background, including the history of artesian water conservation laws enacted by the New Mexico legislature. Storen v. Sexton, 209 Ind. 589, 200 N.E. 251, 104 A.L.R. 1359; Matson Navigation Co. v. United States, 284 U.S. 352, 52 S.Ct. 162, 76 L.Ed. 336; 50 A.J. "Statutes" Sec. 306. These laws, whether superseded or not, may be looked to for assistance in interpreting this statute. Prior to 1931, the legislature had enacted five conservancy statutes, each having for its purpose the prevention of waste of artesian water. In 1931 three conservancy laws were enacted, among them the act under which plaintiff was organized. At that time the artesian well act of 1925 as amended in 1927, was in force. These four acts were in force, and are in *pari materia* and should be construed as one act. Not a single power was expressly granted to any authority in the nine conservancy acts that did not have for its purpose the prevention of waste of artesian water and that alone. I have referred to these conservancy laws, and nothing further on that subject need be added. It has been said "But words are inexact tools at best and for that reason there is wisely no rule of law forbidding resort to explanatory legislative history no matter how 'clear the words may appear on "superficial examination."'" Harrison v. Northern Trust Co., 317 U.S. 476, 63 S.Ct. 361, 363, 87 L. Ed. 407; United States v. American Trucking Ass'ns, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345.

Of course the legislative intent is the law, United States v. Hunt, 81 U.S. 550, 20 L.Ed. 739; Bates v. Brown, 72 U.S. 710, 18 L.Ed. 535; "but in cases admitting of a doubt, the intention of the lawmaker is to be sought in the entire context of the section, statutes or series of statutes in pari materia," Atkins v. Fiber Disintegrating Co., 18 Wall. 272, 21 L.Ed. 841; Hite v. Hite, 301 Mass. 294, 17 N.E.2d 176, 119 A.L.R. 517; The Conqueror, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937; Hennessy v. Walker, 279 N.Y. 94, 17 N.E.2d 782, 119 A.L.R. 1029; Lambert v. Board of Trustees of Public Library, 151 Ky. 725, 152 S.W. 802, Ann.Cas.1915A, 180; 50 A.J., Statutes, Sec. 349, and single words with more than one meaning should not be iso-

lated from all the context and statutes in pari materia to give a legislative act an arbitrary meaning. Demaree v. Scates, 50 Kan. 275, 32 P. 1123, 20 L.R.A. 97, 34 Am. St.Rep. 113; In re Stryker, 158 N.Y. 526, 53 N.E. 525, 70 Am.St.Rep. 489; Harrison v. Northern Trust Co., supra.

"* * * Indeed, it is improper, in construing a statute to take a few words from its context, and, with them thus isolated, attempt to determine their meaning. Moreover, court may not, in order to give effect to particular words, virtually destroy the meaning of the entire context. In some cases, the rule that the meaning of statutory terms is determined by their context is recognized by statute." 50 A.J., Statutes, Sec. 247.

The majority opinion is built upon an unauthorized meaning arbitrarily given to the word "conserve," without regard to the canons of construction that should be resorted to if the legislative intent is in doubt.

A statute of doubtful meaning should be construed in the light of the attendant conditions and time in which it is enacted. Holy Trinity Church v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226; United States v. Stewart, 311 U.S. 60, 61 S.Ct. 102, 85 L.Ed. 40; State ex rel. Wheat v. Moore, 154 Kan. 193, 117 P.2d 598; 50 A.J., Statutes, Sec. 237.

The attendant conditions at the time the conservation district law was passed in 1931 are shown by it and acts in pari materia, without resort to other contemporaneous history. The preamble of Ch. 70, N.M.L. 1931, passed by the same session of the legislature, stated that because of the disintegration of casings, leaks were "materially diminishing the water supply and depleting and destroying the value of the lands irrigated therefrom". It was further stated:

"Whereas, many of said wells have been abandoned and through said condition the waters of said reservoirs are being wasted and depleted and it is necessary, in order to permanently establish and conserve the water of said reservoirs for irrigation purposes, that all such wells be repaired or plugged."

Those were the attendant conditions as the legislature viewed them when the act was passed. It, and those acts in pari materia, were emergency acts passed to save the farming industry of the Pecos Valley, or the legislature so considered them.

It was thought, no doubt, that the $20,-000 appropriation would soon be expended, but that casings would continue to disintegrate, and to provide a permanent remedy the conservancy district act was passed a few days later. Under it the plaintiff was authorized to levy a tax to make improvements for conserving water. Ch. 97, N.M L.1931.

It was never contemplated by the legislature that a well would be drilled outside the bounds of a conservancy district organized under this law as the first two sections of the act conclusively show. They are as follows:

"The purpose of this act is to provide for the organization of artesian conservancy districts to conserve, where necessary, the waters in any artesian basin or basins within the state, the boundaries of which have been scientifically determined by investigations, and where such waters have been beneficially appropriated for private, public, domestic, commercial or irrigation purposes, or otherwise." N.M.Sts. 1941, Sec. 77-1301.

"Any artesian conservancy district organized pursuant to the provisions of this act shall include all lands overlying any such artesian basin and any land outside of the boundaries thereof upon which waters from such basin are being used, either for private, public, commercial, domestic or irrigation purposes, or otherwise. * * *" N.M.Stats.1941, Sec. 77-1302.

Before a district could be organized the boundaries of the artesian basin or basins must have been scientifically determined; and then the district was required to include within its boundaries "all lands overlying any such artesian basin," and land outside upon which the water from the basin was used. This outside land necessarily included only land on which water from wells in the district could be used.

The mischief to be remedied was the waste of water, and every specific power granted to any authority by any of the nine conservancy acts was authority to prevent waste of artesian water, and that only.

It is the general rule that municipal corporations, in the absence of a grant otherwise, have no extra-territorial jurisdiction or authority. Not only is there an absence of such grant to artesian conservancy districts, but there are specific statements in the act itself, and other acts, showing that the general rule was intended to apply to plaintiff.

By Ch. 98, N.M.L.1941 conservancy districts were given jurisdiction over underground waters other than artesian. It was provided by Sec. 1:

"Conservancy District may be given the same rights, power and authority as to all underground waters *within the boundaries of such Conservancy District* as have been or may hereafter be conferred upon such District by said Legislative Act (Ch. 97 N.M.L.1931), and amendments thereto, as to Artesian waters." (My emphasis.)

This clearly shows the legislature intended that the authority of corporations organized under the act of 1931 did not extend beyond the boundaries of the district.

By Sec. 3 of the act of 1941 supra, it is provided that artesian conservancy districts shall have the power to protest or object to any application made to the state engineer to appropriate any waters included *within the boundaries of such conservation district*. The artesian well act of 1925 was re-enacted with some changes in 1935, by Ch. 43, N.M.Laws of that year.

By Sec. 7 of that act the conservancy district is given authority to abate any well *located in that district* that is wasting water.

By Sec. 8 of that act a conservancy district is authorized to prevent waste of water that comes to the surface of the earth "if *the well is situated*" in the district; and by Sec. 10 the state engineer, artesian well supervisor, or "*Conservancy District having jurisdiction*" may abate as a nuisance ditches and storage reservoirs that are wasting more than 20% of the appropriated water.

The original act of 1931 provided that the district should, from year to year, outline a program of water conservation, estimate the cost of administration, equipment, and improvements necessary therefor; which it is provided, shall be paid for by a tax levy on the property *within the district;* and may include the plugging of wells *within the district*. See Sec. 77-1318, copied herein, and Sec. 77-1319.

Every specific grant of power limits the activities of the district to the prevention of waste from wells within its boundaries.

It is a general rule of construction of statutes that when general and specific provisions of a statute are associated therein, that the general words are restricted to a sense analogous to the specific provisions, and may be regarded as thereby limited. Re Stryker, supra.

The plaintiff cites certain irrigation district cases which I discussed in my original dissent. None of these cases support the plaintiff's contention. Ordinarily such districts are under contract to impound and deliver water to their water users, and therefore have a special interest therein.

Plaintiff's reliance, however, is on the case of Coachella Valley County Water District v. Stevens, 206 Cal. 400, 274 P. 538, 540, the facts of which are almost identical with those in this case; but the statutes under which the California district was organized are entirely different from the laws here involved. There is no authority, specific or general, in the New Mexico statutes which authorizes the plaintiff to prosecute this suit, whereas the California district was granted specific authority to prosecute suits to try title to the use of water.

The following quotation from the opinion of the California court in the Coachella

Valley case should satisfy anyone that it is not authority here:

" * * * In this connection it is claimed that it is not shown that there are any lands or other property rights owned by the district which will be injured by the alleged threatened acts of the defendant, and that therefore the defendant is not being sued by the real party or parties in interest. It must be conceded that there is an absence in the complaint of any allegation showing that title to any land or other property is held by the district as such; consequently the authority to maintain the action must appear in the act under which the district was organized, or under that act as supplemented by other statutes bearing on the subject. Otherwise, it has no legal capacity to maintain the action. * * *

"Section 1 of the act provides that 'a county water district may be organized and incorporated and managed as herein expressly provided and may exercise the powers herein expressly granted or necessarily implied.' Section 12 enumerates the powers of the district. Subdivision 2 of that section provides that the district shall have power 'to sue and be sued, except as otherwise provided herein or by law, in all actions and proceedings in all courts and tribunals of competent jurisdiction.' Subdivision 6 of that section as originally enacted provided that the district should have power 'to store water for the benefit of the district, and to conserve water for future use and to appropriate, acquire and preserve water and water rights and· for this purpose to sue, intervene and compromise, in the name of the district, and assume the costs of litigation involving the ownership of waters or water rights within the district and those used and useful for the purposes of the district or of any of the lands situated therein.' In 1923 said section 12 was amended. Stats.1923, p. 312. By the amendment, subdivision 6 was re-enacted in substantially the original form, except that the following was added to the same subdivision, relating to the powers of the district: 'To commence, maintain, intervene in, defend and compromise actions and proceedings to prevent interference with or diminution of the natural flow of any stream or natural subterranean supply of waters used or useful for any purpose of the district or a common benefit to the lands within the district or its inhabitants; and to commence, maintain and defend actions and proceedings to prevent any such interference with the aforesaid waters as may endanger the inhabitants or lands of the district.' "

The Supreme Court of California concluded that the district was *expressly authorized by statute* to bring the suit and therefore under the California law it could do so as agent of the water users. It is said in the majority opinion "It is true that the language conferring statutory authority

to sue in the California case is *more explicit* than any to be found in the act before us." This seems to assume that there is some explicit statutory authority in New Mexico authorizing this suit. No such authority is cited, and there is nothing stated, generally or specifically, in the statutes that indicates the district's authority extends further than the prevention of waste. The only real parties in interest are the water users. The water in question is not wasted, the record shows that it is applied to a beneficial use in irrigating crops. It is obvious that if specific authority had not been granted to the California district to prosecute the suit in the Coachella Valley case, the Supreme Court of that state would have held against the district. It so states in the opinion. We have substantially the same statute in New Mexico. It is as follows:

"That every action shall be prosecuted in the name of the real party in interest; but an executor, administrator, guardian, trustee of an express trust, a party with whom or in whose name a contract has been made for the benefit of another, or a *party authorized by statute* may sue in his own name without joining with him the party for whose benefit the action is brought; and when a statute of the state so *provides,* an action for the benefit of another shall be brought in the name of the state." 1941 Comp. § 19-101, Rule 17(a).

This is a copy of the Federal Rules of Civil Procedure, rule 17(a), 28 U.S.C.A. following section 723c, but we have no statute which authorizes the plaintiff to prosecute a suit in its own name, the purpose of which is to try rights to the use of artesian water. The district itself has no title or right to the use of the water of the artesian basin. It does not and cannot own water rights. It is not a real party in interest, and no statute authorizes it to bring this suit. The majority opinion confers upon plaintiff powers that only water users are entitled to exercise when and as they please.

The decree of the district court was correct and appellee should be granted a rehearing.