193 P.2d 418

PECOS VALLEY ARTESIAN CONSERV-
ANCY DIST. v. PETERS.

No. 5053.

Supreme Court of New Mexico.

May 4, 1948.

O. O. Askren and Richard. G. Bean, both of Roswell, for appellant.

Harold Hurd and L. O. Fullen, both of Roswell, for appellee.

BRICE, Chief Justice.

This action in equity was brought by the appellant to enjoin the appellee from irrigating land by the use of water from a well drilled by him that tapped the Roswell Artesian basin.

This is a second appeal of the case. See the same case, 50 N.M. 165, 173 P.2d 490, 505.

It is alleged substantially by appellant that appellee drilled a well that drew water

from the Roswell Artesian Basin, and with the water from such well irrigated about 285 acres of land, without any permit from the State Engineer. That there was at the time this well was completed, and at the time this suit was filed, no unappropriated water in the Roswell Artesian basin. That the removal of water from the well for the purpose of irrigating appellee's land has and will injure the users of water who have legally appropriated all the water within the boundaries of the Pecos Valley Conservancy District, by decreasing the amount of water they are entitled to use under their several prior appropriations, and which they require for the production of crops and upkeep of their farms, and for other lawful uses. That such use of water will effect an irreparable injury upon those legally entitled to the use of water from the Roswell Artesian basin. The appellant asked for a perpetual injunction against appellee restraining him from the use of water from the well in question.

The appellee answered in substance that he had drilled his well and had applied the water to a beneficial use. That at that time his well was outside the boundaries of the Roswell Artesian basin as defined and declared by the State Engineer, and outside the boundaries of appellant district as it had been established. He denied that there was no unappropriated water in the artesian basin. He stated that after drilling the well and beneficially applying the water, the State Engineer had extended the boundaries of the artesian basin to include his well; that in compliance with the New Mexico statutes he had filed in the State Engineer's office a declaration of ownership of the water right for the use of water from said well sufficient to irrigate 285.6 acres of land; and that his water right was valid and subsisting. The principal question involved is whether there is any unappropriated water that can be withdrawn from the artesian basin through the appellee's artesian well, and be legally used to irrigate his land.

This is an appeal from a trial on the merits. After hearing the evidence the Court made and entered the following decision:

"Findings of Fact

"1. That the so-called Roswell Artesian Basin underlying portions of the surface of the counties of Chaves and Eddy is one continuous basin.

"2. The defendant, Frank Peters, in July, 1942, drilled an artesian well in the N E ¼ S E ¼, Section 22, T 12 S, R 24 E, N. M. P. M., for the purpose of irrigating lands in Sections 22, 23, 26, 27, T 12 S, R 24 E.

"3. That shortly after the defendant commenced said well one of the directors of the Pecos Valley Conservancy District heard about the drilling of the well and one of the directors individually advised the defendant that if he tapped the artesian aqui-

fer the District would bring suit to restrain his use of the water.

"4. That the District did nothing in its official capacity at that time nor until after the well was completed to prevent the drilling of the well by the defendant nor the use of the water from the well until this suit was filed.

"5. That the well brought in by the defendant produces approximately 2,000 gallons of water per minute under pump when in use.

"6. That at the time of the drilling of the well on the lands described, these lands were not within the exterior boundaries of the Pecos Valley Conservancy District as previously fixed by the District Court of Chaves County, nor within the exterior boundaries of the Roswell Artesian Basin, as then declared by the State Engineer of New Mexico.

"7. That the well of the defendant involved in this action taps and draws its entire supply of water from said Roswell Artesian Basin.

"8. That the boundaries of the Pecos Valley Conservancy District have not been enlarged or extended since first defined and set out in 1931, but that the boundaries of the Roswell Artesian Basin have been enlarged several times and extended by declaration of the State Engineer since the original boundaries were fixed by the State Engineer in 1931.

"9. That after the water from the defendant's well had been applied to beneficial use, the State Engineer on October 1, 1942, declared and extended the boundaries of the Roswell Artesian Basin to include the lands and well of the defendant and other lands.

"10. That after drilling the well and applying to beneficial use waters therefrom and after the extension of the boundaries of the Roswell Artesian Basin by the State Engineer, the defendant filed in the office of the State Engineer a declaration of water rights on 380 acres of land in quantities of 2,000 gallons of water per minute, which declaration was subsequently amended to show 285.6 acres.

"11. The defendant has used and applied to beneficial use water from the well on 285.6 acres since August 15, 1942, and is continuing to use said waters beneficially.

"12. That defendant's use of the water from his well has not resulted in injury of or detriment to other users of water of the Roswell Artesian Basin or decrease in the amount of water they are entitled to use under their several permits and prior appropriations. Testimony of expert witnesses offered by plaintiff established the fact that the water table in the Basin has been generally downward throughout the time readings have been taken of specified wells except in the years when excessive recharge of the Basin came through flood water in the area, but there is no proof that any wa-

ter user has suffered damage or diminution of the supply of water to which he is entitled.

"13. That there are a number of leaking wells in the plaintiff District and throughout the Artesian Basin which have not been plugged, and that the water being wasted thereby is more than sufficient, if conserved to supply to this defendant sufficient water to meet his declaration of beneficial use.

"14. That the bringing into operation of the defendant's well has not decreased the amount of water available to any of the prior appropriators and that the water used by defendant's well is so small as to be insignificant in so far as its effect on other appropriators is concerned.

"15. That some of the waters of such basin had been theretofore and were on the 8th day of September, 1931, appropriated to beneficial use under the laws of the State of New Mexico as found and established by the decree of the District Court of Chaves County, New Mexico, organizing and incorporating the plaintiff District on said date.

"Conclusions of Law

"1. That the defendant, Frank Peters, was acting in good faith at the time of the drilling of said well, and at the time of the appropriation of waters from said well to beneficial use, and that the drilling of said well was not in violation of any sound conservation policy.

"2. That the plaintiff District as a matter of law is not to prevail in its complaint against the defendant because of the fact that the defendant's well has not deprived prior appropriators of water to which they were entitled.

"3. That there was unappropriated water within the area in which defendant's well was drilled at the time of the defendant's first beneficial use of water upon the lands described in the amount of 2,000 gallons of water per minute for 285.6 acres.

"4. That the defendant, Frank Peters, has a valid and existing right to the waters of the Roswell Artesian Basin to the extent of 2,000 gallons per minute for the irrigation of 285.6 acres, said right subject to and not to be exercised to the detriment of any other persons having prior, valid and existing rights to the use of waters from said Roswell Artesian Basin.

"5. That the injunction prayed for is denied."

Whereupon judgment was entered in favor of defendant, and plaintiff's bill was dismissed.

Appellant asserts: "The burden of proof is upon defendant to establish that his use of water does not interfere with the use of other appropriators having prior and superior rights; that is to say, the defendant has the burden of proving the existence of surplus water available for his appropriation."

Appellee asserts that is not the law or the rule of evidence applicable in this case; "that if Peters were the plaintiff and seeking to establish his rights as against prior users—in this instance the Conservancy District, claiming to represent all the users of water out of the Artesian Basin—the rule announced would probably apply. But when the District is plaintiff, attacking the right of Peters and asking an injunction, and Peters is compelled to defend against the attack, then the burden is first on the District to prove the amount and extent of use of water claimed under the permits of prior appropriators, and this proof being made, the burden shifts to Peters to show that there is sufficient water, over and above the amount proved to belong to prior users under their permits as prior appropriators, to supply his subsequent appropriation."

The appellant concedes that if there is unappropriated water in the Roswell Artesian Basin to the extent of appellee's claimed right, it has no cause of action. It was stated in the first opinion, "It (plaintiff) may lose on the facts, as for instance by proof there are surplus waters subject to appropriation * * *."

▆ Ordinarily one who asserts a fact in his pleading that must be proved to establish a cause of action, has the burden to prove it. There have been certain rules established by the Supreme Court of California regarding the burden of proof in cases like the present one. Without reviewing all the California cases, we quote from the following:

"The general rule in this state as to the burden of proof is laid down in Section 1981 of the Code of Civil Procedure as follows: 'The party holding the affirmative of the issue must produce the evidence to prove it; therefore, the burden of proof lies on the party who would be defeated if no evidence were given on either side.' However, when one enters a field of water supply and seeks by appropriation to take water from such supply on the claim that there is more than sufficient for all reasonable beneficial uses by those who have the prior and preferential right, it would seem to comport with the principles of fairness and justice that the appropriator, in whatever way the issue may arise, should have the burden of proving that such excess exists. We therefore reaffirm the rule to that effect in the Miller case. [Miller v. Bay Cities Water Co., 157 Cal. 256, 272, 107 P. 115, 122, 27 L.R.A., N.S., 772.]" Peabody v. City of Vallejo, 2 Cal.2d 351, 40 P.2d 486, 498.

This doctrine was extended in Tulare Irr. Dist. v. Lindsay-Strathmore Irr. Dist., 3 Cal.2d 489, 45 P.2d 972, 991:

"For the guidance of the trial court on the retrial of this case, and in future cases, the rule as to the burden of proof under the

new policy should be stated. In the Peabody Case, supra, 40 P.2d 486, at page 498, it is stated: (Here follows the above quotation from the Peabody case). This rule, placing the burden on the appropriator who seeks to take water from a particular water field to show that there is a surplus, does not relieve the riparians and appropriators, who are already in the field, from the burden of proving the quantity of water that they have been using, and that such amount is necessary for their reasonable beneficial purposes. The rule throws on the new appropriator the burden of proving the existence of a surplus from which it can extract the quantity it desires from either the surface or subterranean flow without injury to the uses and requirements of those who have prior rights. In the present case, while it is true the burden was on appellant to prove the existence of a surplus, that burden did not come into existence until after the respondent riparians first proved the amount required by them for reasonable beneficial purposes. This primary burden the riparians did not sustain. The evidence as to the existence of a purported surplus will be discussed more fully hereafter."

 This rule seems to us to be expedient and fair, and we adopt it in this state.

In City of Lodi v. East Bay Municipal Utility Dist., 7 Cal.2d 316, 60 P.2d 439, this same rule was followed.

In Carlsbad Mutual Water Co. v. San Luis Rey Development Co., 78 Cal.App. 900, 178 P.2d 844, 853, it is said on this question:

"Of course, before the plaintiff could invoke the power of a court of equity to restrain the diversion of water above its lands, it would be necessary for it to show first, that there was a wrongful diversion of water above its lands, and second, that the amount wrongfully diverted would be rightfully used by plaintiff and that the water is being used or would be used for reasonable and beneficial purposes. Modoc Land & Live Stock Co. v. Booth, 102 Cal. 151, 156, 36 P. 431; Miller v. Bay Cities Water Co., 157 Cal. 256, 107 P. 115, 27 L.R.A., N.S., 772 * * *."

In the trial of a similar case (Allen v. California Water & Telephone Co., 29 Cal. 2d 466, 176 P.2d 8) testimony was taken for five months, and among other things the court found therefrom the amount of acreage owned by the individual plaintiffs and appearing cross defendants, the amount of water reasonably required for present and future beneficial use for each parcel of overlying land. Also see on this question Tulare Irr. Dist. v. Lindsay-Strathmore Irr. Dist., supra; City of Lodi v. East Bay Municipal Utility Dist., supra.

It should be stated that each of the parties cites the California cases upon this

question as supporting his contention, and we are satisfied with the rule adopted there.

It follows that appellant must have proved the quantity of water legally appropriated by its water users; and the quantity within their appropriations now necessary for their reasonable use. If appellant introduced substantial evidence to prove these facts, the burden of proof then shifted to appellee to establish that there is surplus water which he may beneficially use.

■ An action of this kind is of the nature of a suit to quiet title to realty. Harris v. Chapman, 51 Idaho 283, 5 P.2d 733; Whitcomb v. Murphy, 94 Mont. 562, 23 P.2d 980; Tulare Irr. Dist. v. Lindsay-Strathmore Irr. Dist., supra; and a decree herein is binding on all water users within the Conservancy District, notwithstanding none as individuals were parties to the suit (Pecos Valley Conservancy Dist. v. Peters, supra), as according to that decision, the appellant is the agent of all its water users, with authority as such agent to bind them and their property in this action as effectively as if they were parties in fact.

Without reference to the findings of the court which support the decree, we will review the testimony to ascertain whether appellant established a prima facie case, irrespective of the substantial evidence rule. If we find it did not, then of course the decree will have to be affirmed.

H. S. Cave, a geologist, testified substantially as follows: I am familiar with the Roswell Artesian Basin. From the Sacramento mountains to the west there are porous, permeable beds covering 4000 square miles that extend to within some four miles of Roswell, into which water from rainfall and snow passes, and follows down the incline until stopped in the Roswell artesian basin, or reservoir, and that is the source of the artesian water supply in the Pecos Valley. Before any artesian wells were drilled the water escaped through forced openings and made several small rivers that emptied into the Pecos River. Among these are the Berrendos and the North and South Spring Rivers near the city of Roswell. The water table has lowered, as is shown by the fact that all the rivers have ceased to flow. This indicates that the amount of water taken out has been greater than the intake. There is ample evidence to show that the reservoir receives large quantities of recharge. In my opinion the Peters well taps this Roswell basin, and affects every well in the artesian basin. The basin is approximately 7 miles wide and 60 miles long and comprises about 420 square miles. It extends from a point 7 miles north of Roswell to the mouth of Seven Rivers in Eddy County. The eastern limit is the escarpment that parallels the Pecos River on its east side. There is now more water being taken out than is coming in by recharge.

During years of abnormal rainfall the basin fills up, but the over all picture is a net loss. The basin consists of continuous limestone beds that are porous and permeable. The water moves through these beds because of intercommunication. The general movement of the water is eastward and southeastward. There is a barrier or fault that deflects a very large portion of the artesian water to the north to the Roswell area, which receives more water than further south. The greatest decline in the head of the artesian water is in the south end of the area and the greatest annual fluctation is found there also. The amount of recharge depends upon the quantity of rain and snow run-off from the west. The same principle applies as to water in rivers. The quantity of water for use depends upon its recharge by rainfall and run-off. Periodically the water level is increased by excessive rainfall, while in time of low precipitation the water level lowers with use. There is a recharge in the winter when there is no irrigation, but use and discharge of water ordinarily exceeds the recharge. As the water stored was depleted by the drilling of wells, the drainage into the rivers ceased, and later the wells ceased to flow. Now the wells generally are being pumped. This shows that the hydrostatic head has been depleted and not restored to its initial point. No further development of water can be made without injuring all of the existing wells. I base this statement upon the fact that the wells must now be pumped while at first the water flowed from them. They have had to put in larger casings and larger pumps to get the same amount of water. Larger wells produce more water and permit more efficient use. I cannot answer how much the water in the artesian basin, and the water level, is affected by leaky wells unplugged. If there is any considerable number of them, it would reduce the water in the artesian basin, and this waste reduces the water available for irrigation. There is waste of water both above and below the ground from leaky wells, which tends to waterlog the lands. As the head increases during the winter the underground leakage increases and prevents a rise in the artesian head. Underground leakage from wells, may in some sections, form a major portion of the draft upon the artesian reservoir and without proper steps to remedy such losses the artesian supply may be completely dissipated. There were a considerable number of leaky wells in the district at the time the Peters well was drilled. I don't know how many. The rigid conservation of water in one section will benefit all, just as waste and misuse is detrimental. Additional appropriations or expansion should not be permitted until such time as additional drafts upon the reservoir will not interfere with the rights of present water users.

Charles V. Theis, a hydrauligist, testified substantially as follows: I am a member of the U. S. Geological Survey in charge of the ground water investigations in New Mexico. Since 1926 the Roswell Artesian water levels have been essentially constant except in the north part of the basin where the Berrendo wells declined until the big rains of 1941. The withdrawing of water from the artesian basin will affect to a slight extent every well. It draws from the same basin. The Berrendo well is on the outskirts of the basin. We came to the conclusion several years ago that except in the Berrendo well there was no discernable lowering of the water levels. They would vary from year to year but after ten years their level was just about the same as it was in the beginning of the report. This applies to the whole basin so far as my observation goes. The effect the Peters well (which taps the basin) has on the nearest well would be too small to be observed. We could observe the effect of fifty wells of the size of the Peters well.

Charles A. Miller, a consulting geologist, testified as follows: I am interested in the location of oil properties. I have had some occasion to study the subsurface of the Pecos Valley. The water comes from snowfall and rainfall that travels over the exposed part of the San Andreas area. In my judgment the Peters well taps the artesian basin. There are observation wells maintained by the Water Conservancy District.

One is located on the Berrendo. In 1927 the water stood at a point 15 feet below the surface. The following year at 15.6 feet, the next year at 17 feet; in 1940 it rose materially. After that it again lowered and the trend is still down. Another Berrendo well showed the water 14.6 feet below the surface in 1942; 20.9 in 1943; 13.2 in 1944. Since the year 1940 the over all trend, including 1945, is down. If they are drawing more water out than the intake they are doing damage to the reservoir. According to my theory the Peters well is inflicting injury to all the wells because it is drawing from a common reservoir and the statistics show it is lowering. It would be difficult to figure the amount of water that is caught in the artesian basin. The intake area covers about 4000 square miles. Some of it goes into the Pecos River and is carried away. I only know of the recharge by the rise and fall of the recording wells which change from season to season, year to year, and month to month. Years ago these wells flowed but they have long since ceased to flow. This indicates a lowering of the reservoir.

E. G. Minton, Jr., assistant Artesian Well Supervisor, testified: The spot measurements at the time of various recorder wells indicate the water was lower last summer (1946) than it was in 1945. It comes back in the winter. Last year it was about the same in some areas but in the Artesia area it was lower. No permits for the purpose:

of irrigation have been granted since 1931. Two new wells have been drilled in Roswell, two in Artesia, and two by the Government at the Walker Air Field. 1945 and 1946 were dry years. During the twelve years I have been in office it has gone up and down. We got a nice recharge during the flood but since then it has dropped off some. The boundaries have been extended five times. There are approximately 1000 artesian wells tapping the Roswell Artesian Basin.

Curtis Allman, the manager of the John Tweedy irrigated farms of 1800 acres, has irrigated these farms for 29 years. He stated that he could not tell that his water supply had diminished since the Peters well was drilled. The owners of the 13 other wells nearest the Peters well gave substantially the same testimony as to their respective wells.

Frank Peters, the appellee, testified substantially as follows: I have lived in Chaves County for 30 years. I attempted to get a permit from the State Engineer's office before I started drilling this well, which was refused because my well was outside the artesian basin as then designated. The Engineer told me he would like to see a test made at my place. After I drilled the well I filed a declaration of water right with the State Engineer. The first one was not acceptable and I filed a second which was accepted. A certified copy has been introduced in evidence. Those witnesses who testified that their water supply was not affected by my well, own the nearest wells to mine. While I was drilling the well—or after it was completed, I was told by one of the commissioners of the Conservancy District that the District would protest my right to the use of water. The well cost me about $10,000. After the well was brought in I used the water for irrigation.

Dr. A. D. Crile, former president of the Board of Commissioners of the Conservancy District from its organization in 1932 until 1940, testified: I familiarized myself with the district and found many defective wells. I had been studying this artesian basin since 1912. I helped Mr. Feidler and Mr. Nye with their work in the preparation of the book that has been read in evidence. As a result of this work the law was enacted authorizing the organization of conservation districts for the purpose of conserving water. With the assistance of Scott Andrews and Cliff Smith we made machinery with which we plugged many of the wells after we had found a mud that would do the work. I ascertained the leakage from wells by a device that was put down in the well. A systematic investigation was made. Old abandoned wells that were not in use were first plugged. Every well 30 years old or over was under suspicion, and of these about fifty per cent were leaking. Of 1280 wells over 30 years old, 630 or 640

have been plugged and the remainder have not. We assumed conservatively that the loss from leakage was an average of 200 gallons a minute per well. These leaking wells were making a heavy draft on the basin. To the best of my knowledge and experience from checking wells, there is today at this time in our artesian basin 300 wells that need repairing or plugging and in my judgment are leaking 60,000 gallons of water a minute. We did not plug wells that leaked less than 200 gallons a minute. These wells that need plugging cause a lowering of the water table, and are wasting more and more water as time goes on, and should be plugged. The district has the money, equipment and every thing to do it with. I say there are 300 wells that need plugging because there are 1280 wells over 35 years old. Of those we checked, fifty per cent were leaking. 240 have been plugged since I was a member of the board. I base my judgment on 25 years work and 8 years testing wells. I did not test all the wells.

M. Y. Monical, chairman of the Board of the Conservancy District, testified as follows: At the direction of the Board I contacted Mr. Peters and told him that if he went to the artesian aquifer in drilling his well that we would protest it. I told him three times at least. When he made his application to the State Engineer for the use of the water, we protested it. The Peters well was outside the boundaries of the Conservancy District.

Charles Theis, recalled by appellant, testified as follows: I wish to correct a statement I made yesterday that may be misunderstood. I have checked on water levels in artesian wells from reports made during the last two years. These have just been made available to me. I stated that with the exception of the Berrendo observation well, the water levels of two other observation wells have shown no downward trend from 1926 to 1940 and had risen in 1941 and later began to fall. This statement is true as to water levels as the water stood in December 1945, which was about the low point of earlier years. In December 1945 the mesne level in Orchard Park was 3536 above sea level as against 3529 in December 1927; and the Artesia well in 1945 was 3386.8 feet, as against 3385 feet in December 1934. It must be remembered that the recharge caused by heavy rains in 1941 was unprecedented. The decline from winter highs in the last few years has been very large. The loss at Orchard Park was five feet; in the Artesia well it was 11½ feet from December 1944 to December 1945, which was the latest available record. The summer water levels have declined very greatly in the last few years and indicate an alarming condition. The Berrendo well has declined about four feet in the last two years; the Orchard Park well about 20

feet, and the Artesia well shows a similar rate of fall. The rate of draft on the reservoir at the present time is alarming and although the present storage in the reservoir is not excessively low the present draft may soon affect it greatly.

The fact that the water table rises and falls is not so alarming to us as to some of the witnesses. It is public knowledge that for five years precipitation has been subnormal, and the last three years can be classed as "drouthy years." Irrigation projects generally in the state have suffered from the shortage of water from this cause. But there is an ample supply available in the Roswell district, even though some of it may be classed as storage water. It is quite certain that there will always be water for irrigation from these wells so long as water or snow falls from the clouds over the intake area, though at times the supply may be deficient, as in cases of diversion from flowing streams. We do not mean to say that there is available water for new appropriations. We are advised by counsel that the boundaries of the artesian basin have been extended so that in the future the control of appropriations will be initially through proceedings in the office of the State Engineer.

No attempt was made by appellant to prove the amount of water appropriated by water users owning wells that tapped the artesian basin, or the amount they are entitled to use. It may be, and probably is, true that many of the water users are wasting water, or use more than they are authorized by law to use, or irrigate more land than their appropriations cover, or there is waste of water through leaky wells that can be saved if plaintiff will use ordinary diligence in plugging them. However this may be, the burden was upon appellant to establish the amount of water which owners of wells existing at the time the Peters well tapped the basin, were legally entitled to use. If that had been done, the appellee would have been burdened with proving that there was unappropriated water to which he was entitled, however difficult it would have been to do so.

The appellant did not make a prima facie case, and we are not able to say that the trial court erred in dismissing the bill.

The decree of the District Court should be affirmed, and it is so ordered.

LUJAN and COMPTON, JJ., concur.

SADLER, Justice (specially concurring).

I concur in the result. The trial court found a fact which was a matter of common knowledge, namely, that the Peters well tapped the water of the Roswell Artesian Basin. It did not find as a fact that there was surplus water within the basin subject to appropriation, although concluding as a matter of law that there was un-

appropriated water "within the area" where the Peters well was drilled at the time in question "in the amount of 2000 gallons of water per minute for 285.6 acres." Just what is meant by this conclusion is difficult to understand. At the time in question it was a fact so well known as almost, if not quite, to warrant the trial court in taking judicial notice of same that there were no surplus waters in said basin subject to appropriation. How, then, there could be surplus water in the "area" of this well drilled into a basin having no surplus waters is something that would stand explanation.

The exhaustive Fiedler reports completed in 1931 were based on an extensive study of the waters of the artesian basin. New Mexico appropriated $5,000 to furnish colloboration of our State Engineer with the U. S. Geological Survey in the work incident to preparation of these reports. They are referred to in the dissenting opinion of then justice and present Chief Justice Brice in the former appeal of this case reported at 50 N.M. 165, 173 P.2d 490, 514, as "public records in the office of the State Engineer" and quoted arguendo to sustain his dissenting position. Mr. Fiedler, in his report, touching the existence or not of surplus waters in this artesian basin, says:

"The total draft, both above and below the ground, due to wells is therefore probably in excess of 200,000 acre-feet a year.

A comparison with the 165,000 acre-feet of flow from springs and other natural outlets from the reservoir estimated as being available for use in the artesian area would seem to indicate that the present rate of withdrawal is probably not over 30,000 to 40,000 acre-feet in excess of the safe yield."

And again at page 284 of this report Mr. Fiedler states: "Ground-water supplies, in common with other sources of water supply, are not inexhaustible. *Because of the increased demand for water for irrigation the safe yield of the artesian reservoir has been exceeded.*" (Emphasis mine.)

The situation arising from overdrafts on the water supply of the basin so long ago as 1931 was such that Mr. Fiedler concludes the Chapter of his report entitled "Legal Provisions Governing the Use of the Ground Water" (Page 290 of Report) with the pertinent observations:

*"Further general draft upon the Artesian reservoir should be prevented. * * * Additional appropriations of water for new land or for land that was formerly irrigated and has been abandoned because of insufficient water should not be granted."* (Emphasis mine.)

The author of the prevailing opinion on this appeal thought enough of this report to refer to it as a "public record" in the office of the State Engineer and to quote from it. At that time, in 1931, the fact that all the waters of the artesian basin available for

the purpose already had been appropriated to beneficial use was a matter of such general knowledge that the Tenth Regular Session of the Legislature made the following recitation in the preamble to L.1931, c. 70, then in session appropriating $20,000 for plugging leaky wells as a means of conserving the diminishing water supply, to-wit:

"Whereas, the boundaries of the Artesian Reservoirs, situated in Chaves and Eddy Counties in the Pecos Valley extending southward from above the city of Roswell, have been scientifically and definitely determined; and

"Whereas, *all of the waters of said reservoirs have been beneficially appropriated* and have been made available by the drilling of several hundred artesian wells, many of which have been in use for a long period of time, and because of the disintegration, or rusting of the casings in many of the same the waters which would otherwise be stored in said reservoirs are finding outlet to the surface through the upper strata of the earth or flowing into porous sub-strata where they cannot be used and thereby materially diminishing the water supply and depleting and destroying the value of the lands irrigated therefrom." (Emphasis mine.)

Furthermore, a long established policy of the office of State Engineer has held Roswell Artesian Basin closed to additional filings since 1931 because of prior appropriation of all available waters to beneficial use as shown by the Fiedler report. A policy so long maintained could hardly have escaped public notice especially in the very heart of the artesian basin to which it relates.

The foregoing observations are made only to demonstrate that in so far as the decree under review rests upon the assumption that there are, or at the time of the drilling of the Peters well there were, surplus waters in the Roswell Artesian Basin subject to appropriation, it rests on a false assumption resulting from failure on the part of the plaintiff (appellant) to produce proof of the fact established by the Fiedler report, recognized also by the State Engineer and declared as well by the Legislature in the preamble to L.1931, c. 70—either by invoking judicial notice by the trial court of such fact or by its establishment through other means.

Until the later decision of the Supreme Court of California in Tulare Irr. Dist. v. Lindsay-Strathmore Irr. Dist., 3 Cal.2d 489, 45 P.2d 972, prior decisions of that court seemingly would have cast the burden on the defendant, Peters, in the case at bar to establish that there was a surplus of water in the artesian basin available for appropriation. Miller v. Bay Cities Water Co., 157 Cal. 256, 272, 107 P. 115, 122, 27 L.R.A., N.S., 772 and Peabody v. City of Vallejo,

2 Cal.2d 351, 40 P.2d 486, 498. However, in the Peabody case, supra, the rule as laid down in the two earlier cases is modified in the respect pointed out in the majority opinion and there is no disposition on my part to challenge same. It should be said, however, that a practical application of the rule will preclude injunctive relief against unlawful raids on the existing water supply of any artesian basin. This is so because of the sheer expense to a plaintiff of making the hydrographic survey and furnishing the proof essential in establishing the prima facie case necessary to shift the burden to subsequent appropriator of showing there is a surplus. Until the plaintiff has made out his prima facie case, he will not be entitled to enjoin.

It requires but a moment's reflection to satisfy the mind that the foregoing observation is true. In a suit to adjudicate the waters of the Cimarron river pending for many years in the district court of Colfax County in which the present Chief Justice while judge of the fifth judicial district by designation sat as trial judge there were approximately two hundred and fifty defendants. The actual trial consumed nearly two months. It was a statutory suit to adjudicate waters of the Cimarron stream system brought by the Attorney General under authority of the act hereinafter referred to. Under the rule this day approved on where the burden of proof lies, if an individual water user from that stream instead of the state had instituted suit against a subsequent appropriator, who happened to be without right and a trespasser because there was no surplus water subject to appropriation, before having injunctive relief what must he do?

First, he would have to guage the stream over a period of years to ascertain and prove the quantity of water subject to appropriation. Having done so, he would then have to survey, or cause to be surveyed, every acre of land of the 250 appropriators using water from the stream and establish by proof what a reasonable use of water thereon would demand. In the event such proof showed no surplus, then *and only then,* he might enjoin; otherwise not. The cost of such a procedure would run literally into thousands of dollars. No litigant with sound reason would undertake it. Nevertheless, this seems a difficulty inhering in the very nature of the litigation and one which the legislature alone can remedy. It presents an issue almost as difficult to establish as if one alive today were called upon to prove himself a lineal descendant of Adam.

Our legislature evidently sensed and attempted, although inadequately, to alleviate this burden when it enacted as a part of L.1907, c. 49 (Secs. 18 to 21), provision for hydrographic surveys of stream systems in New Mexico appropriating several thousand dollars to cover the cost thereof, and

authorizing suits by the Attorney General to adjudicate the waters of any stream system, directing the cost of same including that of the hydrographic survey, to be taxed against the private parties to such suits in proportion to the water rights allotted. See 1941 Comp., Secs. 77-401 to 77-411. Resort to this statute, in most instances, for an adjudication of the waters of an entire stream system or artesian basin, would seem to furnish the only escape from an otherwise impossible burden.

The prevailing opinion states that an action of this kind is in the nature of a suit to quiet title to realty, citing Harris v. Chapman, 51 Idaho 283, 5 P.2d 733, Whitcomb v. Murphy, 94 Mont. 562, 23 P.2d 980 and Tulare Irr. Dist. v. Lindsay-Strathmore Irr. Dist., supra. In procedural respects, yes—fundamentally, no. The contention was strongly urged on us in the former appeal by counsel for the defendant (appellee) and accepted by the present Chief Justice in his dissent, that this is a suit to adjudicate water rights. We rejected the contention. The conservancy district owns neither land nor water rights and sues only by virtue of its statutory duty to conserve waters of the artesian basin supplying its water users. Of course, as the plaintiff it must prove the facts entitling it to recover the judgment prayed for. In that respect, it is like a suit to quiet title to real estate. So, also, it is like an action to recover on a note.

One has only to compare this suit with a real suit to adjudicate water rights to be impressed by the points of distinction. One is impressed more by differences than by similarities. See City of Pasadena v. City of Alhambra, Cal.App., 180 P.2d 699, especially portion of the opinion supporting paragraph 9 of the syllabi. The cases cited to support the supposed analogy disclose the disparity. If seeking a true analogy, we would come nearer finding it as respects status of the conservancy district as plaintiff in a suit by a bailee of personal property to protect same against conversion or damage by third parties. The plaintiff there is not the owner, it is true, but is charged by the law of bailment with conserving and protecting the property in custody. So, here, the plaintiff owns neither land nor water right, but as a statutory corporate agency of the water users within the district, it is charged by law with the duty of conserving their water supply.

As well may be inferred from the foregoing, a strong impression prevails in my mind that the judgment in defendant's favor rests fundamentally on the false assumption that surplus waters exist in Roswell Artesian Basin subject to appropriation to beneficial use. Nevertheless, the plaintiff having failed to sustain its burden of making out a prima facie case that all available waters in the basin had already been appropriated to beneficial use

when the Peters well was drilled, my concurrence in the result based on that single ground is herewith noted.

A. W. MARSHALL, District Judge, concurs.